**Darcy TING, et al., Plaintiffs,**

v.

**AT & T, Defendant.**

**No. C 01–02969 BZ.**

United States District Court,
N.D. California.

Jan. 15, 2002.

James C. Sturdevant, Karen L. Hindin, Sturdevant Law Firm, San Francisco, CA, F. Paul Bland, Jr., Arthur H. Bryant, Michael J. Quirk, Trial Lawyers for Public Justice, Washington, D.C., for plaintiffs.

Mark E. Haddad, Bradley H. Ellis, Steven M. Bierman, Catherine Valerio Barrad, Dorothy M. Robins, Peter I. Ostroff, Sidley, Austin, Brown & Wood, Los Angeles, CA, Howard Spierer, AT & T, Basking Ridge, NJ, for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

ZIMMERMAN, United States Magistrate Judge.

In this action, defendant American Telephone and Telegraph Company ("AT & T") is being sued by its California customers for attempting to impose a new contract containing provisions which allegedly violate California contract and consumer protection laws.[1] The complaint was filed in Alameda County Superior Court the day before the new contract was to start taking effect. Defendant immediately removed the action to this court, invoking this court's jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1332. Plaintiffs' motions for a temporary restraining order and for a preliminary injunction were denied. Following stipulation of the parties, this case was certified as a class action pursuant to Fed. Rule Civ. P. 23(a) & (b). Trial commenced on November 13, 2001. Having considered and weighed all the evidence and having assessed the credibility of the witnesses, I now make these findings of fact and conclusions of law as required by Fed. Rule Civ. P. 52(a).

### A. THE PARTIES

1. Plaintiff DARCY TING is a California resident over the age of 18 residing in Berkeley, California. She is presently an AT & T long distance customer, and has been one since approximately 1994. She is employed as a community consumer advocate by plaintiff CONSUMER ACTION.

2. Plaintiff CONSUMER ACTION is a non-profit membership organization committed to consumer education and advocacy. Established in 1971, CONSUMER ACTION is incorporated in California with headquarters in San Francisco, and has approximately 1,500 members nationwide. CONSUMER ACTION is actively involved in policy and legislative advocacy on telephone and utility issues on behalf of consumers at both the state and national levels.

3. Defendant AT & T is a New York corporation with its principal place of business in Basking Ridge, New Jersey. It provides numerous telecommunications, information and other services to residential and business customers throughout the United States. As one example, AT & T offers interstate long distance telephone service to approximately sixty million residential consumers throughout the United States and approximately seven million residential consumers in California. AT & T has offices in California and elsewhere in which it does business related to its residential long distance service.

### B. DETARIFFING BACKGROUND

4. From the passage of the Federal Communications Act of 1934, 47 U.S.C. § 151 *et seq.* ("FCA"), until August 1, 2001, AT & T and other carriers providing interstate long distance service to consumers were required to file with the Federal

---

1. The parties have consented to the jurisdiction of a United States Magistrate Judge for all proceedings, including entry of final judgment, pursuant to 28 U.S.C. § 636(c).

Communications Commission ("FCC") and print and keep open for public inspection a listing of the terms and conditions under which they would provide services to their customers. *See id.* § 203. This listing, called a tariff, also set out the charges, classifications, practices and regulations for each particular service. Once filed, the tariff was subject to FCC regulation and approval. *See id.* § 204. If approved, the tariff exclusively controlled the rights and liabilities of the parties as a matter of law, and "[t]he rights as defined by the tariff [could not] be varied or enlarged by either contract or tort of the carrier." *AT & T v. Central Office Telephone,* 524 U.S. 214, 227, 118 S.Ct. 1956, 141 L.Ed.2d 222 (1998)(quoting *Keogh v. Chicago & N.W. Ry.,* 260 U.S. 156, 163, 43 S.Ct. 47, 67 L.Ed. 183 (1922)).

5. The FCA permits a person harmed by a carrier to file a complaint with the FCC or to bring suit in district court for the recovery of damages. *See* 47 U.S.C. § 207. In interpreting the FCA's tariff requirements, the courts developed the filed rate doctrine which prohibited a regulated entity from charging rates "for its services other than those properly filed with the appropriate federal regulatory authority." *Arkansas Louisiana Gas Co. v. Hall,* 453 U.S. 571, 577, 101 S.Ct. 2925, 69 L.Ed.2d 856 (1981). The doctrine also prevented "an aggrieved customer from enforcing contract rights that contravene[d] governing tariff provisions or from asserting estoppel against the carrier." *Fax Telecommunicaciones v. AT & T,* 952 F.Supp. 946, 951 (E.D.N.Y.1996). Because the rate making procedures and resulting tariffs were public documents, the consumer's knowledge of the published rate was presumed. Consequently, claims of carrier misrepresentation were barred, *see AT & T v. Central Office Telephone,* 524 U.S. at 222, 118 S.Ct. 1956 (citing *Kansas City Southern R.R. Co. v. Carl,* 227 U.S. 639, 653, 33 S.Ct. 391, 57 L.Ed. 683 (1913)), as

were claims for breach of contract involving fraudulent carrier conduct relating to privately negotiated lower rates. *See Wegoland, Ltd. v. NYNEX Corp.,* 27 F.3d 17, 22 (2d Cir.1994). Although the doctrine sometimes led to seemingly harsh and unfair results, *see Maislin Indus., U.S., Inc. v. Primary Steel Inc.,* 497 U.S. 116, 130–31, 110 S.Ct. 2759, 111 L.Ed.2d 94 (1990); *Louisville & Nashville R.R. v. Maxwell,* 237 U.S. 94, 97, 35 S.Ct. 494, 59 L.Ed. 853 (1915), courts left the enforcement of tariffs to the regulators, who were seen as best situated to determine whether the regulated entities were engaging in fraud or other illegal conduct. *See Wegoland,* 27 F.3d at 21.

6. After the decision in *United States v. AT & T,* 552 F.Supp. 131 (D.D.C.1982), *aff'd sub nom., Maryland v. United States,* 460 U.S. 1001, 103 S.Ct. 1240, 75 L.Ed.2d 472 (1983), in which AT & T was divested and the pay telephone operations of the Bell operating companies were separated from those of AT & T, a number of lawsuits were filed by consumers in response to business practices, such as slamming, that arose as carriers started competing to provide long distance telephone services. Notwithstanding the filed rate doctrine, the courts began to permit a number of these lawsuits, including a number of class action suits. *See, e.g., Marcus v. AT & T,* 138 F.3d 46, 62–63 (2d Cir.1998) ("[A] suit for injunctive relief appears not to interfere with the nondiscrimination policy underlying the filed rate doctrine .... [I]f the appellants can establish the substance of their state and federal common law fraud claims, the filed rate doctrine would not bar them."); *Gelb v. AT & T,* 813 F.Supp. 1022, 1032 (S.D.N.Y.1993) (filed rate doctrine inapplicable to a class action which alleged universal fraud and concealment of rates because the claim did not implicate the core concerns of the doctrine); *Day v. AT & T,* 63 Cal.App.4th 325,

331, 74 Cal.Rptr.2d 55 (1998)(filed rate doctrine does not apply to bar a class action seeking to enjoin misleading or deceptive practices under state consumer protection laws). *See also* cases cited *infra* ¶ 63.

7. In the Telecommunications Act of 1996, Congress directed the FCC to forbear from applying any provision of the FCA if the FCC found that:

> (1) enforcement of such regulation or provision is not necessary to ensure that the charges, practices, classifications, or regulations by, for, or in connection with that telecommunications carrier or telecommunications service are just and reasonable and are not unjustly or unreasonably discriminatory;
>
> (2) enforcement of such regulation or provision is not necessary for the protection of consumers; and
>
> (3) forbearance from applying such provision or regulation is consistent with the public interest.

47 U.S.C. § 160(a) (1996). One of the principal purposes in passing this Act was to "make it possible for the FCC immediately to forebear [sic] from economically regulating each and every competitive long-distance operator ...." 141 Cong. Rec. S7881–02, S7888 (1995). As Congressman Cox stated, deregulation would take the country out of the "regulatory thicket that has shackled the industry." *Communications Law Reform: Hearings Before the Subcomm, on Telecommunications and Finance of the Comm. on Commerce House of Representatives*, 104th Cong. 15 (1995). Senator Slade Gorton emphasized that the Act would allow:

> States to preserve and advance universal service, protect the public safety and welfare, ensure the continued quality of telecommunications services, and **safeguard the rights of consumers, which are, of course, the precise goals of this Federal statute itself.**

141 Cong. Rec. S8206–02, S8212 (1995)(emphasis added).

8. As part of deciding whether to forbear from enforcing § 203 of the FCA pursuant to this statutory authority, the FCC issued a series of notices and orders which established the FCC's intent to abolish the filed rate doctrine. In describing its preference for complete detariffing rather than permissive detariffing, the FCC stated:

> Complete detariffing would also further the public interest by eliminating the ability of carriers to invoke the 'filed-rate' doctrine.... In addition, complete detariffing would further the public interest by preventing carriers from unilaterally limiting their liability for damages. Accordingly, by permitting carriers unilaterally to change the terms of negotiated agreements, the filed rate doctrine may undermine consumers' legitimate business expectations. Absent filed tariffs, the legal relationship between carriers and customers will much more closely resemble the legal relationship between service providers and customers in an unregulated environment. Thus, eliminating the filed rate doctrine in this context would serve the public interest by preserving reasonable commercial expectations and protecting consumers.

*Second Report and Order In the Matter of Policy and Rules Concerning the Interstate, Interexchange Marketplace,* ("*Second Report and Order*"), 11 F.C.C.R. 20,-730, ¶ 55, 1996 WL 633345 (1996). The FCC also stated that "[t]he public interest benefit of removing carriers' ability to invoke the 'filed-rate' doctrine applies equally with respect to terms and conditions as to rates." *Id.* ¶ 155. Significantly, the FCC envisioned its own complaint procedures existing concurrently with judicial remedies in the new detariffing regime.

"In the absence of such tariffs, consumers will not only have our complaint process, but will also be able to pursue remedies under state consumer protection and contract laws." *Id.* ¶ 42. The FCC noted that "in the absence of tariffs, consumers will be able to pursue remedies under state consumer protection and contract laws in a manner currently precluded by the 'filed rate' doctrine." *Id.* ¶ 38.

9. AT & T filed a Petition for Limited Reconsideration and Clarification with the FCC in an attempt to resolve what it thought was an ambiguity in the Commission's position on whether the FCA would continue to govern the reasonableness of rates, terms and conditions of interstate service. The FCC granted in part and denied in part AT & T's petition, stating:

> the [FCA] continues to govern determinations as to whether rates, terms, and conditions for interstate, domestic, interexchange services are just and reasonable, and are not unjustly or unreasonably discriminatory. [However,] **we note that the [FCA] does not govern other issues, such as contract formation and breach of contract, that arise in a detariffed environment.** As stated in the Second Report and Order, consumers may have remedies under state consumer protection and contract laws as to issues regarding the legal relationship between the carrier and customer in a detariffed regime.

*Order on Reconsideration In the Matter of Policy and Rules Concerning the Interstate, Interexchange Marketplace ("Order on Reconsideration"),* 12 F.C.C.R. 15,014, ¶ 77, 1997 WL 473330 (1997) (emphasis added).

10. The FCC finally determined, in a series of Orders upheld by the Court of Appeals for the District of Columbia Circuit, *see MCI WorldCom v. FCC,* 209 F.3d 760 (D.C.Cir.2000), to exercise its forbearance authority under the Telecommunications Act of 1996 to end the practice of setting rates, terms and conditions through tariffs pursuant to the FCA. Instead, the FCC required long distance carriers to establish contracts with their residential long distance consumers that would govern the rates, terms, and conditions of interstate long distance service. The FCC initially set a date of January 31, 2001, for the mandatory "detariffing" of interstate domestic interexchange services, which it extended twice, first to April 30, 2001, then to July 31, 2001. Thus, beginning August 1, 2001, all long distance carriers had to form contracts with their existing long distance residential customers.

11. The FCC has posted a web page entitled "Detariffing Interstate Long Distance Telephone Service: What Customers Need to Know." It states in part:

> **What protections do I have, now that companies don't have to file anything with the FCC?** You are protected by the full range of state laws, including those governing contract, consumer protection, and deceptive practices. For example, state contract law determines what constitutes an agreement between you and your long distance company. **Where do I file a complaint if I have problems with my interstate long distance service company?** You may contact your state consumer protection agency, Better Business Bureau, or State Attorney General Office to learn about the protections and remedies available under your state contract and consumer protection laws. You may also file a complaint with the FCC if an interstate long distance company has violated FCC rules.

(Pls.' Ex. 205–2.)

12. As a result of the FCC's decision to order detariffing, absent the contract provisions in dispute here, class members would have the same rights to sue AT & T

in court as would any person doing business with AT & T, unless the suit is over a service governed by a tariff which survived detariffing, such as AT & T's "dial around" service.

### C. AT & T'S RESPONSE TO DE-TARIFFING

13. To prepare to do business after detariffing, AT & T formed a detariffing team composed of dozens of individuals from several AT & T departments under the overall supervision of Louis Delery, Vice President for Consumer Long Distance Services. The team commenced work in the summer of 2000. AT & T eventually spent approximately $30 million to implement its detariffing obligation, which included the development of a standardized contract for use with its customers. AT & T called the contract the Consumer Services Agreement ("CSA").

14. AT & T decided in early 2000 to include in the CSA a series of provisions designed to limit the parties' rights and remedies in the event of a dispute. In the final version of the CSA, these provisions are contained in sections 4 and 7 (hereinafter, the "Legal Remedies Provisions").

15. For many years, AT & T has sponsored the AT & T Consumer Strategy and Issues Council ("AT & T Consumer Council" or "Council"). The Council is composed of consumer advocates and meets five to six times per year. Ken McEldowney, executive director of plaintiff CONSUMER ACTION, has served as Chair of the Council for the past several years, and has served on the Council for approximately fifteen years.

16. AT & T decided to include the Legal Remedies Provisions in the CSA before a draft was presented to the Consumer Council, and was not willing to change its decision regardless of how the Council reacted. In a series of internal e-mails, AT & T officials stated that "we owe the Council a response before we set things in stone . . . . [W]e want to gauge their reaction on what we're willing to change and what we're not—especially arbitration," (J. Ex. 39–1), and "[A]lthough the Consumer Panel had strong opinions against binding arbitration, Legal's recommendation was equally strong that it remains as a condition of the Service Agreement." (Pls.' Ex. 134–1.)

17. Drafts of the CSA, a cover letter to customers, and a set of Frequently Asked Questions ("FAQs") were discussed at two Consumer Council meetings, September 20, 2000, and April 5, 2001. Members of the Council, including Mr. McEldowney, expressed substantial concern about parts of the Legal Remedies Provisions such as the binding arbitration provision in the CSA, raised questions about the enforceability of portions of the Legal Remedies Provisions under California law, and raised concerns about the clarity of some portions of the CSA and a need for foreign-language translations.

18. These concerns were noted by AT & T. A memo entitled "Detariffing Briefing with Consumer Council, Wednesday, September 20, 2000," states in part:

Dispute Resolution—this component of the service agreement is very objectionable to the advocates. They have a philosophical aversion to the concept of mandatory arbitration as a means to satisfy consumer disputes. They were particularly troubled by the clause preventing customers from participating in class action suits against AT & T. One influential member threatened to resign from the council if we adopt this clause.

(J. Ex. 13–1.)

19. AT & T tried to justify to the Council the need for the Legal Remedies Provisions by referring to the costs associated with class action lawsuits. AT & T was asked to provide information regard-

ing these costs and the burden they allegedly place on AT & T, but did not do so.

20. Members of the Consumer Council, especially Mr. McEldowney, objected to AT & T's desire to implement the CSA without requiring any affirmative assent from its customers—the so called "negative option."[2] While the Council suggested at least one alternative, AT & T determined to implement the CSA as a negative option. AT & T believed that a significant number of its customers would never affirmatively signify their assent to the CSA, that any process designed to obtain individualized informed consent to legal services would be very expensive, and that no such process was likely to produce a response from all or most of AT & T's approximately sixty million residential long distance consumers.

21. AT & T's acceptance of the Council's input was limited to the means by which the Legal Remedies Provisions were communicated to AT & T's customers, rather than the substance of the provisions themselves. For example, AT & T improved some of the contract language, though the language of the Legal Remedies Provisions remained substantially the same, and translated the contract documents into other languages.

22. AT & T conducted market research to assist it in developing the contract documents. One part of AT & T's research, the Quantitative Study, included the following key findings and recommendations:

In the letter it should be made clear that this agreement is being sent for informational purposes only. The fact that no action is required on the part of the customer needs to be made. [sic] A strong link establishing that this information is not a 'call to action' on the part of the customer should be clearly stated in the letter .... Customers should understand that the mailing is being sent to comply with a federal mandate and does not imply any change in their relationship with AT & T.

(J. Ex. 10–6.)

23. Another part of AT & T's research, the Qualitative Study, concluded that after reading the bolded text in the cover letter which states "**[p]lease be assured that your AT & T service or billing will not change under the AT & T Consumer Services Agreement; there's nothing you need to do**," "[a]t this point most would stop reading and discard the letter." (J. Ex. 9–9.) One of the authors of the study did not find this conclusion to be a cause of concern, and no one on the detariffing team ever expressed concern to her about this conclusion.

24. On the contrary, AT & T was concerned that if its customers focused on the Legal Remedies Provisions, they might become concerned, less likely to perceive detariffing as a non-event and possibly defect. As a high ranking member on the detariffing team stated: "I don't want them to tell customers that now individual

---

**2.** Much of the trial testimony centered around AT & T's decision to present the CSA as a "negative option"—as an offer that could be accepted by doing nothing other than continuing to use AT & T's service even when the customer was not aware of the offer. Plaintiffs argue that this manner of contract formation is unacceptable in California, at least with respect to an offer that requires a waiver of jury trial, given that the right to a civil jury trial is guaranteed by the California Constitution and given the strict requirements under

California law for validly waiving that right in a variety of contexts. *See* Cal. Const. art. I, § 16. *See also Isbell v. County of Sonoma*, 21 Cal.3d 61, 145 Cal.Rptr. 368, 577 P.2d 188, *cert. denied*, 439 U.S. 996, 99 S.Ct. 597, 58 L.Ed.2d 669 (1978) (invalid waiver of right to jury trial in cognovit note); *Exline v. Smith*, 5 Cal. 112 (1855) (invalid waiver of jury trial by court rule). Because I have concluded that AT & T's offer contained illegal and unconscionable terms which must be enjoined, I do not reach this contract formation issue.

contracts need to be established with customers and pay attention to the details [sic]." (Pls.' Ex. 132–1.) While presenting the CSA as a non-event may have helped AT & T retain its customers, it also made customers less alert to the fact that they were being asked to give up important legal rights and remedies.

## D. AT & T'S MAILING OF THE CSA

25. Between May 2 and June 9, 2001, AT & T mailed the CSA, a cover letter, and the FAQs to approximately eighteen million of its residential long distance customers whom it bills directly by including these materials in the envelope that contained the customer's bill (hereinafter, the "billing mailing"). No statement regarding the CSA appeared on the outside of the envelope. The CSA, cover letter and FAQs are attached at the end of these findings and conclusions as "Attachments 1–3," respectively.

26. The billing mailing was highly likely to be opened. However, a reasonable class member would not have expected the billing statement to contain a new contract, and therefore might well have discarded the CSA as a stuffer. A class member would have been more likely to read the CSA had the envelope stated that a new contract was included with the bill, which AT & T did not do.

27. To its remaining forty-two million residential long distance customers, AT & T mailed the CSA, a cover letter and the FAQs in a separate envelope (hereinafter, the "separate mailing"). On the outside of this envelope appeared the statement: "**ATTENTION:** Important Information concerning your AT & T service enclosed." This envelope is attached at the end of these findings and conclusions as "Attachment 4." A substantial number of class members did not open the separate mailing and therefore were unaware, as they continued to use their service, that AT & T would consider that they had agreed to a new contract. AT & T's Quantitative Study had concluded that approximately 1/4 of its customers "are not even likely to open the [separate mailing]." (J. Ex. 10–4.) AT & T's Quantitative Study had found that approximately 10% of its customers would not even skim or glance at the CSA contained in the separate mailing, and only 30% of its customers would actually read the entire CSA. This is consistent with plaintiffs' research presented in the Lake–Snell survey.

28. The Lake–Snell survey commissioned by plaintiffs concluded that the vast majority of class members had either not opened or not read the CSA. However, this survey is flawed at least with respect to the absence of screening procedures to determine whether survey participants were AT & T residential long distance customers, and if they were, whether they were the household member who would have dealt with a mailing from AT & T. (Pls.' Ex. 209–7–9, Questions 1, 4–5, 9, 14–15.) With regard to the participants that actually received and read the CSA, the survey is helpful and discloses the expectation of many consumers that before they can be bound to a contract they must in some affirmative fashion manifest their voluntary assent. (*Id.*, Questions 6–8, 10, 12–13.) While I attached less weight to the responses to questions 2–3 and 11, since the form of the questions could have been improved, I could not ignore the clear trend of these answers, which indicate that people are unlikely to read solicitations received in the mail, even if from AT & T. Nor could I ignore their consistency with the results of AT & T's research.

29. The phrase "Important Information" is increasingly associated with junk mail or solicitations. AT & T was aware of this from the research of its Qualitative

Study. The person managing AT & T's detariffing communications testified that AT & T and others who send mailings to customers overuse the phrase "Important Information," although she claimed that associating the phrase with junk mail "may be an exaggeration."

30. From the perspective of affecting a person's legal rights, the most effective communication is generally one that is direct and specific. In this case, that would have been to boldly place on the separate mailing envelope at least the message that a new contract was enclosed rather than the generic "Important Information" notification.

31. During July 2001, plaintiff DARCY TING received in the mail from AT & T and opened and read the "separate mailing." Prior to receiving this mailing, plaintiff TING was not aware of the obligation that AT & T or other long distance carriers had to establish a contract with their residential customers. She was not expecting to receive a mailing from AT & T concerning the CSA or detariffing.

32. In the summer of 2001, most class members did not expect to receive a new contract from AT & T, let alone one which could be accepted by performance. Class members, like any consumers in an ongoing relationship with a business, have a reasonable expectation that material changes to the relationship will be communicated to them. AT & T's methods of communicating the new CSA downplayed the material changes presented by the Legal Remedies Provisions.

33. Of the people who opened either mailing, a substantial number likely did not read it at all and a larger number did not read it thoroughly. This was exacerbated by the message in the documents that the customer would not have to do anything upon their receipt and by AT & T's overall message of reassurance to its customers that detariffing was a "non-

event." The cover letter introduced the concept of assent by non-action by bolding the statement: "**Please be assured that your AT & T service or billing will not change under the AT & T Consumer Services Agreement; there's nothing you need to do.**"

34. The CSA was an offer which by its terms could be accepted without anyone needing to sign and return a document. According to the second paragraph of the CSA:

**BY ENROLLING IN, USING, OR PAYING FOR THE SERVICES, YOU AGREE TO THE PRICES, CHARGES, TERMS AND CONDITIONS IN THIS AGREEMENT. IF YOU DO NOT AGREE TO THESE PRICES, CHARGES, TERMS AND CONDITIONS, DO NOT USE THE SERVICES, AND CANCEL THE SERVICES IMMEDIATELY BY CALLING AT & T AT 1 888 288–4099\* FOR FURTHER DIRECTIONS.**

The CSA recites that it would become effective as a contract beginning on August 1, 2001.

35. Consumers with local telephone service may use AT & T's long distance service without being subject to the terms of the CSA by using AT & T's dial-around service, 10–10–345. This service allows consumers to make long distance calls through AT & T that are billed to them by their local phone company. Consumers who use AT & T's dial-around service are not parties or subject to the CSA. AT & T did not present this service to class members as an alternative to the CSA. The CSA and the FAQs simply and inconspicuously mention that the CSA does not apply to "calls made by dialing 10–10–345." If AT & T intended this service to be an alternative for those customers who did not want to accept the Legal Remedies Provisions, as it now contends, it should

have presented it as an alternative in the mailing.

36. The CSA is a pre-printed document drafted and prepared entirely by AT & T. If a California AT & T long distance customer contacted AT & T and expressed unhappiness with any of the Legal Remedies Provisions, AT & T did not provide that person with an opportunity to negotiate those terms because of its policy prohibiting any waiver or modification of the CSA.

### E. CUSTOMER CHOICE

37. The market for residential long distance services is highly competitive. Nationally, more than 700 companies provide long distance telephone service. In California, at least 19 companies provided long distance telephone service in the summer of 2001. In the second quarter of 2001, the market share of residential long distance service in California, measured by the number of residential customers selecting a particular carrier as their primary long distance carrier, was as follows: 44.0% for AT & T; 14.2% for MCI; 8.8% for Verizon; 5.0% for Sprint; 1.7% for Qwest; 0.7% for Working Assets; and 25.6% for all other companies.

38. Since the FCC ordered detariffing, AT & T is not the only long distance provider who has attempted to include legal remedies provisions containing a mandatory arbitration clause in its agreement with its customers. MCI, Sprint, Qwest and Working Assets Long Distance (among other companies) have also sought to impose similar provisions. The long distance providers who have imposed substantially similar legal remedies provisions have a combined market share of well over 65% of all California long distance customers.

39. Verizon California, a carrier with 8.8% of the residential long distance service market in California as of the second quarter of 2001, does not require its residential long distance customers to agree to binding pre-dispute arbitration or to waive class actions.

40. Customers did not have any meaningful choice with respect to the Legal Remedies Provisions because the carriers who service 2/3 of the California market all include substantially similar dispute resolution provisions in their contracts. AT & T customers who specifically complained about the unfairness of the arbitration provision were sent a written response which in part told them, "All of the other major long distance carriers have also included an arbitration provision in their service agreements." (Pls.' Exs. 177, 186.)

41. In the summer of 2001, it would have been difficult for class members to have learned the identity of the minority of carriers who did not impose legal remedies provisions substantially similar to those of AT & T. It would have been virtually impossible for class members who do not have internet access or are not sophisticated internet users.

42. The principal features upon which consumers choose a carrier are price and service, not legal remedies provisions, since the typical consumers do not expect to have a dispute with their long distance carriers that cannot be resolved informally. A class member dissatisfied with price and service can change carriers easily. A class member dissatisfied with her legal remedies can change carriers once the problem that invokes those remedies has occurred, but she is locked into the remedies in the contract in effect at the time the problem arose.

43. Class members calling with questions about the Legal Remedies Provisions were unlikely to get meaningful answers. Frequently, they would be referred to the written materials or to a recording. AT & T's customer representatives and their su-

pervisors were instructed not to discuss arbitration.

44. AT & T's position is best summarized by a document entitled "Detariffing—Customer Handling Experience," which was circulated to managers involved in the detariffing process. It states in part: "Canned responses will be provided to service reps which will reinforce that the customer needs to do nothing and will direct them to the IVR, website or to write-in for additional information." (J. Ex. 45–2.)

### F. AT & T'S LITIGATION EXPERI- ENCE

45. The Legal Remedies Provisions attempt to limit the class members to four dispute resolution mechanisms: (i) informal contact with AT & T's customer account representatives; (ii) an action in small claims court; (iii) a complaint to a federal or state agency; and (iv) binding arbitration before the American Arbitration Association ("AAA").

46. The undisputed testimony is that 99% of all customer complaints about billing and service are resolved through informal contact with customer representatives.

47. California class members may bring an action in small claims court for claims up to $5,000. The filing fee for such actions is generally $20.00. A class member who files in small claims court must represent herself. In the year 2000, AT & T was named as a defendant in 367 small claims court cases, of which 55 were filed in California.

48. In 2000, AT & T was named as a defendant in 59 consumer long distance suits filed in other courts (not small claims courts) nationwide. It appears that the principal types of claims which members of the class can expect to litigate outside small claims court are not individual billing disputes or disputes about poor service, but claims of intentional misconduct, such

as discrimination or harassment in the course of providing service, credit reporting problems and problems relating to identity theft and claims that involve practices or problems that pertain to all or a group of consumers. Examples of group claims include complaints about the way AT & T is measuring the length of a call or complaints that AT & T has misrepresented the terms of a calling plan in its advertising. If a consumer complains about such a practice, AT & T can try to satisfy the consumer by making a billing adjustment, but it cannot change its practice as to only that consumer without being considered discriminatory under the FCC's standards. In other words, if AT & T decided on an informal basis to measure the length of one class member's phone calls a certain way, it would be discriminating in violation of the FCA if it measured the calls of other similarly situated class members differently.

49. Under the CSA, if (a) the amount at issue in a dispute between a class member and AT & T is $10,000.00 or less, exclusive of interest, arbitration fees, and costs; (b) the claimant in the dispute chooses to arbitrate the dispute; and (c) the claimant chooses to arbitrate by submitting documents ("desk arbitration") or by telephonic hearing, the AAA's Consumer Rules will apply.

50. Rule 6 of the AAA Consumer Rules states:

A party may request in writing that the arbitrator hold one hearing by telephone. The telephonic hearing may occur even if the other party refuses to participate. An additional $100 fee will be charged to the business for a telephonic hearing. If a party wants to have an in-person hearing, instead of a telephonic hearing, the dispute must be

administered under the AAA's Commercial Arbitration Rules. (J. Ex. 15–5.)

51. If the consumer chooses to have an in-person arbitration hearing, or the claim is in excess of $10,000, the AAA's Commercial Rules and fee schedules apply. Under the Commercial Rules, for claims of $1.00 to $10,000, the AAA's filing fee is currently $500. For claims between $10,000 and $75,000, the AAA's filing fee is $750. For claims between $75,000 and $150,000, the AAA's filing and service fees total $2000. The AAA's Commercial Rules require each party to bear the expenses of the witnesses it produces. All other expenses of the arbitration, including required travel and other expenses of the arbitrator, AAA representatives, any witness or the cost of any proof produced at the direct request of the arbitrator are shared equally by the parties, unless they agree otherwise or unless the arbitrator assesses those expenses or some portion of them against a party in the award.

52. Rule 51 of the AAA's Commercial Rules, entitled "Administrative Fees," states:

As a not-for-profit organization, the AAA shall prescribe an initial filing fee and a case service fee to compensate it for the cost of providing administrative services. The fees in effect when the fee or charge is incurred shall be applicable.

The filing fee shall be advanced by the party or parties making a claim or counterclaim, subject to final apportionment by the arbitrator in the award. The AAA may, in the event of extreme hardship on the part of any party, defer or reduce the administrative fees.

(J. Ex. 16–18.)

53. Rule 54 of the AAA's Commercial Rules, entitled "Deposits," states:

The AAA may require the parties to deposit in advance of any hearings such sums of money as it deems necessary to cover the expense of the arbitration, including the arbitrator's fee, if any, and shall render an accounting to the parties and return any unexpended balance at the conclusion of the case.

(J. Ex. 16–19.)

54. AT & T subsidizes a customer's cost of initiating either a document or telephonic arbitration of a claim of under $1,000. Normally, the AAA charges consumers $125 as the standard filing fee for such a proceeding. This fee is intended to cover one half of the arbitrator's fee ($250). Under Section 7(c) of the CSA, however, AT & T will pay all but twenty dollars of that fee plus all other AAA costs and fees for claims under $1,000. For claims above $1,000 but below $10,000 arbitrated on documents or telephonically, the customer would pay the full filing fee of $125 and AT & T would pay all other AAA costs. For those customers who elect to proceed with a live arbitration proceeding or assert a claim in excess of $10,000, the AAA requires that the arbitration proceeding be subject to the AAA's Commercial Rules. The prevailing party may seek to recover the AAA's fees and the expenses of the arbitrator from the other party.

55. Rule 53(b) of the AAA's Commercial Rules, entitled "Neutral Arbitrator's Compensation," states, "[a]rbitrators shall be compensated at a rate consistent with the arbitrator's stated rate of compensation, beginning with the first day of hearing in all cases with claims exceeding $10,000." (J. Ex. 16–19.)

56. Different AAA arbitrators charge different hourly rates. To estimate the costs of an arbitration to be conducted under the AAA's Commercial Rules, a claimant must learn the hourly rate of the arbitrator who will hear the case. To determine the hourly rate of the specific

AAA arbitrators who may hear a particular case under AAA's Commercial Rules, a claimant must first initiate an arbitration with the AAA and, unless the fee is waived or deferred by AAA, must pay any filing fee. This makes it difficult for a class member before filing to meaningfully estimate the cost to have the case arbitrated under the Commercial Rules. Neither the AAA website or rules, nor the AT & T website, provides a class member with any information about likely arbitrator's fees.

57. A random sampling compiled by an AAA Vice President of 82 arbitrators on the AAA Commercial Panel in Northern California provides the following compensation information: (a) arbitrator compensation ranges from $600 to $3,850 per day; (b) the average (mean) daily rate of arbitrator compensation is $1,899; (c) the median daily rate of arbitrator compensation is $1,750.

58. While AAA has a list of arbitrators willing to arbitrate matters on a pro bono basis, the Commercial Rules include no information from which a claimant could learn about the existence of its pro bono panel, or how to request that one be assigned to a pro bono arbitrator. AAA's designated representatives on the subject of the waiver and deferral of arbitration fees were unable to say how many arbitrators currently serve or have served on pro bono panels in California, or how many cases have been handled by pro bono arbitrators.

59. The AAA may, in the event of extreme hardship on the part of any party, defer or reduce its administrative fees. A party seeking a deferment or reduction must supply the AAA with financial details documenting the claim of extreme hardship in affidavit form. The party must also provide AAA with copies of the past two years federal tax returns, along with bank statements for the past three months. Further financial records and documentation could be requested, depending on the case.

60. No AAA rule governs when it will or will not waive or defer its administrative fees. No publicly available documents describe the criteria used for determining what constitutes extreme hardship. There are no internal AAA documents that define or discuss how waivers or deferrals should be granted. The last two people responsible for evaluating such requests received no training or instruction in how to evaluate such requests.

61. Although AAA frequently grants requests for administrative fee reductions, waivers or deferrals, it rarely waives or defers its fees entirely. Instead, AAA more typically defers a portion of its fees to a later date in the proceeding, such as the hearing.

62. Based on AT & T's testimony, it is unlikely that the typical customer dispute about service or under $1000 will be resolved through arbitration; it most likely will be resolved by AT & T's customer care representatives or their supervisors. Fewer than one percent of customer complaints not resolved by customer care representatives or their supervisors have resulted in litigation.

63. In recent years, the following are among the lawsuits filed against AT & T and its competitors by their customers that were not barred by the filed rate doctrine:

a. A putative class action case captioned *Allen v. AT & T* pending in the District Court for Muskogee County, Oklahoma, alleging AT & T fraudulently and in breach of contract collected a municipal sales tax which was either (1) not authorized by law or (2) not remitted in full to the proper taxing authority. Plaintiff is seeking restitution, a declaratory judgment and other damages. His individual claim is less than $1 a month.

b. *In re AT & T Consumer Class Action Litigation* (also captioned *Freedman v. AT & T*), which was settled in the Superior Court of New Jersey, Somerset County, Law Division, on July 27, 2000. According to the Settlement Agreement, the alleged overcharges involved AT & T's practice of charging class members for certain per-minute usage charges in a month subsequent to the month in which the usage occurred, even when the subscribers had not used all of their contractually-provided for minutes for either the month in which the usage occurred or the month in which the subscriber was billed for the usage. AT & T ultimately paid $1.98 million, which was 100% of the 83,611 class members' damages, as well as the costs of notice and settlement administration.

c. In a suit against one of AT & T's competitors, *In re: MCI Non–Subscriber Telephone Rates Litigation*, MDL Docket No. 1275 (S.D.Ill.), the plaintiffs alleged that MCI had improperly charged higher Non–Subscriber Rates and Surcharges for certain long distance calls. A settlement reached in October of 2000 created an $88 million Settlement Fund.[3]

64. It would not have been economically feasible to pursue the claims in these cases on an individual basis, whether the case was brought in court or in arbitration. If the Legal Remedies Provisions contained in AT & T's new CSA had governed customers' rights in these situations, it is highly unlikely any of the claims would have been prosecuted. It is undisputed that the lawyers who represented the plaintiffs in these cases would not have taken them if the only claim they could have pursued was the claim of the individual plaintiff. The reasons for this are not hard to see. The actual damages sought by the named plaintiffs are relatively insubstantial. The damage limitations in the Legal Remedies Provisions attempt to make any award of substantial damages, even if justified, highly unlikely. Consequently, it would not make economic sense for an attorney to agree to represent any of the plaintiffs in these cases in exchange for 33⅓% or even a greater percentage of the individual's recovery. The lawyer would almost certainly incur more in costs and time charges just getting the complaint prepared, filed and served than she would recover, even if the case were ultimately successful. Simply put, the potential reward would be insufficient to motivate private counsel to assume the risks of prosecuting the case just for an individual on a contingency basis. While retaining counsel on an hourly basis is possible, in view of the small amounts involved, it would not make economic sense for an individual to retain an attorney to handle one of these cases on an hourly basis and it is hard to see how any lawyer could advise a client to do so. The net result is that cases such as the ones listed above will not be prosecuted even if meritorious. Thus, the prohibition on class action litigation functions as an effective deterrent to litigating many types of claims involving rates, services or billing practices and, ultimately, would serve to shield AT & T from liability even in cases where it has violated the law.

---

**3.** *See also Lipton v. MCI WorldCom, Inc.,* 135 F.Supp.2d 182, 189 (D.D.C.2001) (putative class action against MCI for charging higher rates for long distance calls than were authorized under the appropriate tariff was not barred by the filed rate doctrine); *Crump v. WorldCom, Inc.,* 128 F.Supp.2d 549, 556 n. 4 (W.D.Tenn.2001) (citing *AT & T v. Central Office Telephone,* 524 U.S. at 222, 118 S.Ct. 1956 (1998)) (the filed rate doctrine does not bar plaintiffs from pursuing "state law claims based upon long distance provider's misrepresentation.").

65. There likely will be other claims which a class member may have in which potential damages would ordinarily be much more than nominal. Examples include discrimination or harassment in the provision of service, identity theft, fraudulent sales tactics, or harassing debt collection techniques. In such cases, the costs associated with preparing an arbitration claim and presenting it for even a "desk arbitration" would likely exceed the recovery any consumer could reasonably expect to obtain given the cost of arbitration and the limitations on damages and attorneys fees in the Legal Remedies Provisions. These Provisions make it unlikely that a class member, unless she wanted to represent herself, would be able to pursue many of the sorts of claims that are to be expected in the ordinary business-customer relationship. And as one consumer attorney pointed out, cuts in funding make it unlikely that legal aid programs will have the resources to address such cases or would give them attention given the larger grievances of other clients.

66. AT & T did not produce any testimony from any practicing lawyer, or any other evidence, that any of the cases discussed in paragraph 63 would be economically feasible to litigate under the Legal Remedies Provisions of the CSA. There was some conclusory contradiction from one of defendant's experts, Professor Priest, which I did not find convincing inasmuch as he does not practice in this area and his conclusions were largely unsupported by any evidence. Instead, it contends that such claims should be pursued before the FCC.

67. The FCC has a complaint procedure that enables AT & T customers to file claims against AT & T with the FCC. The claim procedure is explained, among other places, on a website maintained by the FCC at www.fcc.gov. The website describes procedures for filing both formal and informal complaints, contains links to on-line complaint forms and other related sites, and provides contact and other information on related topics, such as how the FCC processes consumer complaints that it receives.

68. A review of FCC reports for the past ten years discloses that until recent years there are very few reports of FCC decisions involving a complaint by an individual consumer against a long distance carrier. Most of the complaints in recent years have concerned "slamming," the unauthorized substitution of a consumer's preferred long distance carrier for another without proper consent. It was largely undisputed at trial that it took the FCC approximately seventeen years before it effectively responded to "slamming" complaints.

69. In recent years, in response to consumers' complaints, the FCC has initiated investigations which ultimately resulted in changes in telephone company practices and in the imposition of forfeitures, or the payment of "voluntary contributions," to the United States Treasury. At defendant's request, I took judicial notice of 14 orders of the FCC adopting consent decrees or imposing forfeitures or notices of apparent liability, all of which issued during the year 2000. With the exception of *In the Matter of MCI WorldCom Communications, Inc.*, 15 F.C.C.R. 12,181 (2000), in which the FCC approved a mechanism for providing some credit to certain consumers adversely impacted by the company's practices, *see id.* at 12,182, the FCC does not appear to have concerned itself with obtaining individual relief for the complainants, even in situations where the FCC has concluded the carrier committed an "egregious" practice.

70. For example, in *In the Matter of Business Discount Plan, Inc.*, 15 F.C.C.R. 14,461 (2000), the FCC imposed a forfei-

ture of $2.4 million against the company for willful or repeated violations of the act and previous FCC rules and orders. *See id.* at 14,474. Although the company appears to have refunded $12,144.53 to the thirty complainants that were the focus of the investigation, *see Order on Reconsideration In the Matter of Business Discount Plan, Inc.,* 2000 WL 1785129 at ¶ 13 (2000), nowhere in its order did the FCC require the company to pay damages or provide refunds to any of the other thousand of complainants who had led to the investigation.

71. This is not surprising, since the FCC has stated that it does not consider the award of damages to a class of individuals to be consistent with its consumer complaint procedures. *See Certified Collateral Corp. v. Allnet Communications Serv.,* 2 F.C.C.R. 2,171, 2,173, 1987 WL 344054 (1987)(FCC Rules do not contemplate class action complaints). In the matter of *Jeffrey Krauss v. MCI,* 14 F.C.C.R. 2,770, 1999 WL 55003 (1999), after MCI had paid Mr. Krause damages arising out of his slamming complaint, the FCC refused to consider an award of damages to a class of complainants who were similarly situated to Mr. Krause, even though it had found that MCI had violated Mr. Krause's rights by converting his phone and facsimile lines without his authorization in violation of § 64.1100 of the FCC's rules and § 258 of the FCA. *See id.* ¶¶ 7–8. Instead, the FCC required that each complainant file an individual complaint under Section 208 and noted that ruling otherwise "would in effect transform the Section 208 complaint proceeding into a class action suit, a result neither contemplated by nor consistent with, the private remedies created

under Sections 206 through 209 of the Act." *Id.* ¶ 10. This limitation that the FCC has placed upon itself was recently recognized by the D.C. Circuit Court of Appeals. *See Hi–Tech Furnace Sys. v. FCC,* 224 F.3d 781, 792 n. 22 (D.C.Cir. 2000). Nor have I seen a single report of the FCC addressing a consumer complaint for an intentional tort allegedly committed by a carrier. Under all these circumstances, I find that the FCC is not a forum before which a class member can effectively vindicate her right to recover damages from AT & T in a variety of contexts. Nor is the FCC an effective forum for a class of similarly situated consumers seeking to recover damages from AT & T for a class wide practice without each consumer having to file an individual complaint under Section 208.[4] Presumably, it was in recognition of factors such as these that caused Congress in enacting the FCA to give parties wronged by a carrier a choice of fora—the FCC or the courts. *See* 47 U.S.C. § 207.

72. As to AT & T's purpose in devising the Legal Remedies Provisions, Mr. Delery testified that AT & T "wanted to give the consumers a broad range of options" to resolve disputes, and that AT & T wanted to avoid "opening up the business to lawsuits that really have no merit." I find this testimony to have been somewhat disingenuous. Absent the Legal Remedies Provisions, consumers would have a broad range of legal options available, and the limitations on consumers' rights and remedies in the Legal Remedies Provisions apply to all suits, even those with merit. Based on all the evidence before me, I find that AT & T's principal purpose was to put

---

**4.** AT & T's contention assumes that the FCC has the resources and the desire to become the forum of choice for resolving consumer complaints, a subject about which there is considerable debate within the FCC. *See In the Matter of Qwest Communications Int'l,* *Inc.,* 15 F.C.C.R. 14,699, 14,702, 2000 WL 1006228 (2000)(Furchtgott–Roth, C., dissenting); *In the Matter of MCI WorldCom Communications, Inc.,* 15 F.C.C.R. at 12,207 (2000)(Furchtgott–Roth, C., dissenting).

sufficient obstacles in the path of litigants to effectively deter many claims from being pursued.

## G. CALIFORNIA CONSUMER PROTECTION LAWS

■ 73. The complaint seeks declaratory and injunctive relief, alleging that the Legal Services Provisions of the CSA violate California's Consumer Legal Remedies Act, Cal. Civ.Code §§ 1750, *et seq.* ("CLRA"), and California's Unfair Practices Act, Cal. Bus. & Prof.Code §§ 17200, *et seq.* ("UPA"). The parties agree that California law governs the question of whether the CSA is a validly formed contract. AT & T, while denying generally that the Legal Remedies Provisions violate California law, contends that this case presents only one issue governed by California Law—whether a valid contract was formed when AT & T mailed the CSA to the class and its members continued to use AT & T's service. Specifically, AT & T contends that whether its Legal Remedies Provisions are unconscionable is under California law not an issue of contract formation but rather a defense to contract enforceability, and that once a contract is formed, questions about its enforceability are governed either by the Federal Communications Act or by New York law, through a choice of law provision in the CSA.

■ 74. AT & T is wrong. Under California law a party may prevent the formation of a contract which includes an unconscionable provision by enjoining the inclusion of that provision in the contract. In California, "[i]t is essential to the **existence of a contract** that there should be ... a lawful object ...." Cal. Civ.Code § 1550(3)(Deering 1994) (emphasis added). "Where a contract has several distinct objects, of which one at least is lawful, and

one at least is unlawful, in whole or in part, the contract is void as to the latter and valid as to the rest." *Id.* § 1599. Something that is "contrary to the policy of express law" is unlawful. *Id.* § 1667. Here, one of the objects of the CSA, contained in the Legal Remedies Provisions, is to alter dramatically the legal landscape upon which disputes between AT & T and the class are to be resolved. The class contends, for reasons that will be discussed later, that AT & T is trying to achieve this object in ways that are illegal and unconscionable. If the class is correct, then under California contract law, the CSA is void as to those provisions and valid as to the remainder.[5] The provisions which sought to effect the unlawful object never come into legal existence. *See Tiedje v. Aluminum Taper Milling Co.*, 46 Cal.2d 450, 453–54, 296 P.2d 554 (1956)("A contract made contrary to public policy or against the express mandate of a statute may not serve as the foundation of any action, either in law or in equity...."); *First Nat'l Bank v. Thompson*, 212 Cal. 388, 405–06, 298 P. 808 (1931)(contract void due to illegality "has no legal existence for any purpose....").

75. The California mechanisms for resolving disputes about the legality of contract provisions include the two invoked by the plaintiff class: the CLRA and the UPA. The CLRA provides in pertinent part that:

(a) The following unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer **are unlawful**:

. . .

---

**5.** In this action, the plaintiff class is not challenging any other provisions of the contract,

so the balance of the contract will be presumed lawful.

(19) Inserting an unconscionable provision in the contract.

Cal. Civ.Code § 1770(a)(19)(Deering 1994 & Supp.2001) (emphasis added).[6]

76. A consumer who suffers damage as a result or use of any of the acts or practices declared to be unlawful under section 1770 may, as was done here, bring a class action to obtain injunctive or other relief. *See id.* §§ 1780(a), 1781(a). Significantly, the CLRA also contains an anti-waiver provision:

> "[a]ny waiver by a consumer of the provisions of this title is contrary to public policy and **shall be unenforceable and void.**"

*Id.* § 1751 (emphasis added).

 77. Notwithstanding defendant's assertions to the contrary, the CLRA was intended to allow courts to address the unconscionability of contract terms as an issue of contract formation. The plain language of the statute provides plaintiffs with the right to bring an action to enjoin a party from inserting an unconscionable provision into a contract, which is precisely what plaintiffs contend AT & T attempted to do by inserting the Legal Remedies Provisions in its offer. While the other party can always defend against an effort to enforce the illegal or unconscionable provision, that is not the other party's only recourse, as AT & T contends. The other party can also seek to enjoin operation of that provision, as plaintiffs have done here. *See California Grocers Ass'n v. Bank of America,* 22 Cal.App.4th 205, 217, 27 Cal.Rptr.2d 396 (1994)("[The CLRA] expressly permits a consumer to bring an action for damages and injunctive relief based on insertion of an unconscionable provision in a contract."); *Dean Witter Reynolds v. Superior Court,* 211 Cal. App.3d 758, 766–68, 259 Cal.Rptr. 789 (1989)(distinguishing the ability to bring an

affirmative cause of action for unconscionability under the CLRA from the mere codification of the defense of unconscionability in Cal. Civ.Code § 1670.5, and applying the case law of unconscionability to the CLRA's affirmative cause of action).

78. An analysis of the UPA leads to the same conclusion. Under the statute, a plaintiff is entitled to injunctive relief against any person performing or proposing to perform an "unlawful, unfair or fraudulent business practice ...." Cal. Bus. & Prof.Code § 17200 (Deering 1992). The UPA recognizes the necessary interplay between the unfair competition provisions and other state laws, stating that "[u]nless otherwise expressly provided, the remedies or penalties provided by this chapter are cumulative to each other and to the remedies or penalties available under all other laws of this state." *Id.* § 17205. Prohibiting "any unlawful business act or practice" under the UPA includes prohibiting "anything that can properly be called a business practice and that at the same time is forbidden by law." *Barquis v. Merchants Collection Ass'n,* 7 Cal.3d 94, 113, 101 Cal.Rptr. 745, 496 P.2d 817 (1972). Accordingly, this broad standard encourages the UPA to "borrow" violations of other laws and treat these violations as independently actionable and subject to the distinct remedies contained in the UPA. *See Farmers Ins. Exchange v. Superior Court,* 2 Cal.4th 377, 383, 6 Cal.Rptr.2d 487, 826 P.2d 730 (1992). Courts have found that "placing unlawful or unenforceable terms in form contracts" constitutes "unfair business practices" for purposes of imposing liability under the UPA. *See State Farm Fire & Casualty Co. v. Superior Court,* 45 Cal. App.4th 1093, 1104, 53 Cal.Rptr.2d 229 (1996), *questioned on other grounds, Cel-Tech Communications, Inc. v. Los Ange-*

---

**6.** Section 1761 of the CLRA defines "person" to include a corporation. *See id.* § 1761.

les *Cellular Telephone Co.*, 20 Cal.4th 163, 83 Cal.Rptr.2d 548, 973 P.2d 527 (1999). *See also California Grocers Ass'n*, 22 Cal. App.4th at 218, 27 Cal.Rptr.2d 396 (suggesting that the UPA encompasses an affirmative cause of action for unconscionability). If the CSA violates the CLRA, it will also violate the UPA. Therefore, the legality and unconscionability of the Legal Remedies Provisions will be decided according to California law.[7]

## H. ILLEGALITY

### 1. Limitations on Liability under Cal. Civ.Code § 1668

■ 79. The Legal Remedies Provisions limit the type and amount of damages that class members are entitled to recover from AT & T.[8] Plaintiffs contend

---

7. AT & T argues that even if the issue of contract formation includes an analysis of the lawfulness of the Legal Remedies Provisions, federal law and FCC guidelines should govern rather than California state contract and consumer law. This will be addressed more thoroughly below. *See* discussion *infra* Part J. AT & T does not specify what federal law or FCC regulation would govern the unconscionability and illegality issues presented by the Legal Remedies Provisions. Suffice it to say that, in contrast to the Legal Remedies Provisions, the provisions approved under federal law by the United States Supreme Court in *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991), subjected the parties to the New York Stock Exchange Rules on arbitration, which allowed equitable relief, "collective proceedings," written arbitration awards summarizing the issues and available to the public, and had no apparent limitations on liability. *See id.* at 30–32.

AT & T alternatively argues that the lawfulness of the Legal Remedies Provisions should be governed by New York contract law pursuant to the choice-of-law provision in the CSA. I need not reach the issue. Putting aside the question of whether New York law would apply, *see Ticknor v. Choice Hotels Int'l*, 265 F.3d 931, 938 (9th Cir.2001), or what the New York consumer protection laws are, if the Legal Remedies Provisions are void because they are unlawful or unconscionable under California law, they were never valid to begin with, thereby mooting the determination of the choice-of-law provision's applicability.

8. Section 4 of the CSA is titled "**Limitations on Liability**" and states as follows:

THIS SECTION DESCRIBES THE FULL EXTENT OF OUR RESPONSIBILITY FOR ANY CLAIMS YOU MAKE FOR DAMAGES CAUSED BY THE FAILURE OF THE SERVICES, OR ANY OTHER CLAIMS IN CONNECTION WITH THE SERVICES OR THIS AGREEMENT.

IF OUR NEGLIGENCE CAUSES DAMAGE TO PERSON OR PROPERTY, WE WILL BE LIABLE FOR NO MORE THAN THE AMOUNT OF DIRECT DAMAGES TO THE PERSON OR PROPERTY. FOR ANY OTHER CLAIM, WE WILL NOT BE LIABLE FOR MORE THAN THE AMOUNT OF OUR CHARGES FOR THE SERVICES DURING THE AFFECTED PERIOD. FOR ALL CLAIMS, WE WILL NOT BE LIABLE FOR INDIRECT OR CONSEQUENTIAL DAMAGES, INCLUDING BUT NOT LIMITED TO, LOST PROFITS OR REVENUE OR INCREASED COSTS OF OPERATION. WE ALSO WILL NOT BE LIABLE FOR PUNITIVE, RELIANCE OR SPECIAL DAMAGES. THESE LIMITATIONS APPLY EVEN IF THE DAMAGES WERE FORESEEABLE OR WE WERE TOLD THEY WERE POSSIBLE, AND THEY APPLY WHETHER THE CLAIM IS BASED ON CONTRACT, TORT, STATUTE, FRAUD, MISREPRESENTATION, OR ANY OTHER LEGAL OR EQUITABLE THEORY.

WE WILL NOT BE LIABLE FOR ANY DAMAGES IF SERVICES ARE INTERRUPTED, OR THERE IS A PROBLEM WITH THE INTERCONNECTION OF OUR SERVICES WITH THE SERVICES OR EQUIPMENT OF SOME OTHER PARTY. THIS SECTION WILL CONTINUE TO APPLY AFTER THE AGREEMENT ENDS.

Section 7(a) of the CSA also contains language limiting plaintiffs' liability, and states in part:

THE ARBITRATOR MAY NOT AWARD DAMAGES THAT ARE NOT EXPRESSLY AUTHORIZED BY THIS AGREEMENT AND MAY NOT AWARD PUNITIVE DAMAGES OR ATTORNEYS' FEES UNLESS SUCH DAMAGES ARE EXPRESSLY AUTHORIZED BY A STATUTE. YOU AND

that the plain language of these provisions sweeps broadly, extending to liability for both negligence and intentional conduct, and that AT & T impermissibly has limited its liability for claims other than negligence to the amount of charges for service during the affected period, and shielded itself from liability for punitive, reliance, special and consequential damages. As so construed, plaintiffs argue, the Legal Remedies Provisions violate Cal. Civ.Code § 1668, which provides:

> All contracts which have for their object, directly or indirectly, to exempt anyone from responsibility for his own fraud, or willful injury to the person or property of another, or violation of law, whether willful or negligent, are against the policy of law.

80. In arguing that the Legal Remedies Provisions extend beyond claims for negligence, plaintiffs rely on a number of clauses, such as: "[t]his section describes the full extent of our responsibility for … any other claims in connection with the services or this agreement"; "[f]or any other claim, we will not be liable for …";

**AT & T BOTH WAIVE ANY CLAIMS FOR AN AWARD OF DAMAGES THAT ARE EXCLUDED UNDER THIS AGREEMENT.**

9. During the preliminary injunction hearing, AT & T agreed that the Legal Remedies Provisions limit AT & T's liability for intentional misconduct. (Prelim. Inj. Tr. at 111, lns. 17–22.) AT & T now argues they do not. If AT & T is so uncertain over the meaning of one of the principal Legal Remedies Provisions, how can the class members be expected to have understood to what they were agreeing?

10. While the inclusion of two punitive damages provisions may appear to support AT & T's argument, AT & T conceded that the punitive damages language in section 7(a) was placed there at the request of the AAA. (Prelim. Inj. Tr. at 115, lns. 1–11.) This explains its placement in Section 7(a), entitled "Dispute Resolution," and not in Section 4, entitled "Limitations of Liability," and explains

"[f]or all claims, we will not be liable for …"; and "[t]hese limitations … apply whether the claim is based on contract, tort, statute, fraud, misrepresentation, or any other legal or equitable theory." CSA § 4.

81. AT & T now contends that section 4 only applies to limitations on liability for negligent conduct.[9] AT & T argues that the section was intended to distinguish between negligence claims involving damages to people or property and all other negligence claims, not all other claims. AT & T also argues that the ban on punitive damages in section 4 only applies to negligence claims, and that section 7(a), which states that "[t]he arbitrator … may not award punitive damages or attorneys' fees unless such damages are expressly authorized by a statute," governs claims for intentional misconduct. *Id.* § 7(a).[10] Finally, AT & T argues that the reference in section 4 to claims "based on contract, tort, statute, fraud, misrepresentation, or any other legal or equitable theory" was merely intended to apply to allegations of negligence dressed in other legal theories.[11]

its wording as a limitation on the arbitrator's authority, whereas the ban on punitive damages in Section 4 is worded as a limitation on AT & T's liability. The AAA must have read Section 4 the same way as I do—as a ban on punitive damages even in cases of intentional misconduct or statutory violation, if it requested the inclusion of the language that now appears in Section 7(a).

11. Under AT & T's interpretation, only claims based on negligence, however pleaded, would be subject to arbitration because section 7(a)'s language mirrors that of section 4, stating that "any disputes arising out of or related to this Agreement (whether **based in contract, tort, statute, fraud, misrepresentation, or any other legal or equitable theory**) must be resolved by final and binding arbitration." CSA Section 7(a) (emphasis added). Yet AT & T has vigorously contended that all plaintiffs' claims, whether relating to intentional or negligent conduct, are subject to final and binding arbitration under the CSA.

82. AT & T's current interpretation of the liability limitations proves more than AT & T intends. If section 4 only applies to liability for negligent conduct, as AT & T contends, and the only other language in the entire CSA relating to liability for other conduct states that "[t]he arbitrator may not award damages that are not expressly authorized by this agreement and may not award punitive damages or attorneys' fees unless such damages are expressly authorized by a statute," CSA § 7(a), then there exists no basis upon which an arbitrator could award compensatory damages if she finds intentional misconduct or statutory violations. Put another way, since an arbitrator cannot award damages not expressly authorized in the CSA, then she could not possibly award compensatory damages for intentional conduct because they are not provided for anywhere in the CSA. If, on the other hand, I were to accept plaintiffs' interpretation of section 4, there would at least exist a basis upon which an arbitrator could award compensatory damages for intentional conduct, albeit one unacceptably limited to the amount of charges for the customer's services during the affected period.

83. Neither interpretation passes muster under Civil Code Section 1668, which makes it illegal for a party to exempt itself from liability for most types of intentional or illegal misconduct. *See Farnham v. Superior Court,* 60 Cal.App.4th 69, 71, 70 Cal.Rptr.2d 85 (1997)("[C]ontractual releases of future liability for fraud and other intentional wrongs are invariably invalidated.").[12] The former has the effect of exempting AT & T from all liability for intentional conduct, something clearly pro-

hibited under California law. *See McQuirk v. Donnelley,* 189 F.3d 793, 796–97 (9th Cir.1999)("*Farnham* thus stands for the proposition that § 1668 invalidates the total release of future liability for intentional wrongs."); *Blankenheim v. E.F. Hutton & Co., Inc.,* 217 Cal.App.3d 1463, 1471–72, 266 Cal.Rptr. 593 (1990)("Under [§ 1668], a party may not contract away liability for fraudulent or intentional acts or for negligent violations of statutory law."); *Baker Pac. Corp. v. Suttles,* 220 Cal.App.3d 1148, 1154, 269 Cal.Rptr. 709 (1990)("[A] release from liability for fraud and intentional acts … on its face violates the public policy as set forth in Civil Code section 1668."). The latter impermissibly limits AT & T's liability for such intentional conduct as fraud. *See Klein v. Asgrow Seed Co.,* 246 Cal.App.2d 87, 100–01, 54 Cal.Rptr. 609 (1966)(agreement limiting the liability of the manufacturer to a refund of the price of the seed would violate Cal. Civ.Code § 1668). The limitations on liability are also contrary to the FCC's expectations that "complete detariffing would further the public interest by preventing carriers from unilaterally limiting their liability for damages." *Second Report and Order,* 11 F.C.C.R. 20,730, ¶ 55 (1996).

84. AT & T argues that notwithstanding the limiting language in section 7(a), an arbitrator would be allowed to award any relief for intentional conduct authorized by law. Although this may be true as to punitive damages and attorneys' fees,[13] as to any other damages, it disregards basic arbitration law. While arbitrators, in fashioning an appropriate choice of remedies, "may base their decision upon

---

**12.** In view of this result, I do not consider whether there may be other instances in which the limitations on liability in the Legal Remedies Provisions would violate California law.

**13.** This assumes that an award under Cal. Civ.Code § 3294, which authorizes punitive damages in cases of oppression, fraud or malice, is one "expressly authorized by a statute."

broad principles of justice and equity," they may not do so if they are "specifically restricted by the agreement to following legal rules . . . ." *Advanced Micro Devices v. Intel Corp.*, 9 Cal.4th 362, 374–75, 36 Cal.Rptr.2d 581, 885 P.2d 994 (1994). *See also United Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 597, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960)("[A]n arbitrator is confined to interpretation and application of the [governing] agreement; he does not sit to dispense his own brand of industrial justice. He may of course look for guidance from many sources, yet . . . [w]hen the arbitrator's words manifest an infidelity to this obligation, courts have no choice but to refuse enforcement of the award."); *Moncharsh v. Heily & Blase*, 3 Cal.4th 1, 8, 10 Cal.Rptr.2d 183, 832 P.2d 899 (1992) (quoting *O'Malley v. Petroleum Maintenance Co.*, 48 Cal.2d 107, 110, 308 P.2d 9 (1957)) ("The powers of an arbitrator are limited and circumscribed by the agreement or stipulation of submission."). Here, the Legal Remedies Provisions expressly provide that "the arbitrator shall be bound by and strictly enforce the terms of this Agreement and may not limit, expand or otherwise modify its terms." CSA § 7(a). They further prohibit the arbitrator from awarding damages "not expressly authorized by this Agreement . . . ." *Id.*

■ 85. A solution proposed by AT & T, that it would notify the AAA of the true meaning of the Legal Remedies Provisions, does not save the Provisions for a number of reasons. It would require the court to ignore a violation of law based on a representation in court that AT & T would not seek to take advantage of the violation. It is not at all clear how the AAA would respond or how this representation would work out in practice. It would be very unfair to the class, since in deciding whether to pursue a claim, the class would assume they were limited by the Legal Remedies Provisions and not by

some side agreement between AT & T and the AAA.

■ 86. Finally, AT & T argues that the Legal Remedies Provisions should not be read literally for to do so would produce "nonsensical results." (Def.'s First Am. Trial Br. at 23.) That is one of the risks AT & T assumed when it undertook in a few sentences to rewrite a substantial body of law governing its relations with its customers. AT & T is simply asking the court to do too much. The plain language of section 4 cannot be read in the manner that AT & T proposes. Even if AT & T intended section 4 to only apply to negligent conduct, and even if it intended an arbitrator to be able to award any relief authorized by law, it did not clearly provide for this in the CSA. I do not have the authority to rewrite or reform the legal services provisions so that they do not lead to absurd results. *See Armendariz v. Foundation Health Psychcare Services*, 24 Cal.4th 83, 125, 99 Cal.Rptr.2d 745, 6 P.3d 669 (2000) (citing *Kolani v. Gluska*, 64 Cal.App.4th 402, 407–08, 75 Cal.Rptr.2d 257 (1998))(the power to reform is limited to instances in which parties make mistakes, not to correct illegal provisions).

### 2. Waiver of Statutory Rights under the CLRA

■ 87. The Legal Remedies Provisions also violate public policy by seeking to impose an effective waiver of the statutory rights provided to class members under the CLRA. "[P]arties agreeing to arbitrate statutory claims must be deemed to 'consent to abide by the substantive and remedial provisions of the statute. Otherwise, a party would not be able to fully vindicate [his or her] statutory cause of action in the arbitral forum.'" *Armendariz*, 24 Cal.4th at 101, 99 Cal.Rptr.2d 745, 6 P.3d 669 (quoting *Broughton v. Cigna Healthplans*, 21 Cal.4th 1066, 1087, 90 Cal.

Rptr.2d 334, 988 P.2d 67 (1999))(omitting citations). *See also Gilmer*, 500 U.S. at 28, 111 S.Ct. 1647 (quoting *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.*, 473 U.S. 614, 637, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985)) ("[S]o long as the prospective litigant effectively may vindicate [his or her] statutory cause of action in the arbitral forum, the statute will continue to serve both its remedial and deterrent function."). Any waiver of the statutory rights provided for under the CLRA "shall be unenforceable and void." Cal. Civ.Code § 1751.[14]

88. The CSA's ban on class actions and its imposition of a two year limitations period on the filing of claims are the most apparent efforts to effect a waiver of the class members' statutory rights under the CLRA. Section 1781(a) of the CLRA states:

> Any consumer entitled to bring an action under Section 1780 may, if the unlawful method, act, or practice has caused damage to other consumers similarly situated, bring an action on behalf of himself and such other consumers to recover damages or obtain other relief as provided for in Section 1780.

Cal. Civ.Code § 1780(a). The CSA, however, provides for resolution of disputes through arbitration before a neutral arbitrator "instead of . . . through a class action," CSA § 7, and states that "no dispute may be . . . resolved on a class-wide basis." *Id.* § 7(a). The CSA therefore violates plaintiffs' rights to bring a class action under the CLRA and is "contrary to public policy and . . . unenforceable and void." Cal. Civ.Code § 1751.

89. Similarly, section 1783 of the CLRA states:

> Any action brought under the specific provisions of Section 1770 shall be commenced not more than three years from the date of the commission of such method, act, or practice.

*Id.* § 1783. The two year limitation clause in the CSA, *see* CSA § 7(b), expressly waives this three year statute of limitations, and is therefore unenforceable and void under the CLRA's anti-waiver provision. *See* Cal. Civ.Code § 1751.

## I. THE UNCONSCIONABILITY OF THE CSA

90. Under California law, unconscionability has both a procedural and substantive element. *See Armendariz*, 24 Cal.4th at 114, 99 Cal.Rptr.2d 745, 6 P.3d 669; *Blake v. Ecker*, 93 Cal.App.4th 728, 742, 113 Cal.Rptr.2d 422 (2001); *Flores v. Transamerica Homefirst*, 93 Cal.App.4th 846, 853, 113 Cal.Rptr.2d 376 (2001); *A & M Produce Co. v. FMC Corp.*, 135 Cal. App.3d 473, 486, 186 Cal.Rptr. 114 (1982). The procedural element focuses on "oppression," which "arises from an inequality of bargaining power that results in no real negotiation and an absence of meaningful choice," or "surprise," which "involves the extent to which the supposedly agreed-upon terms are hidden in a prolix printed form drafted by the party seeking to enforce them." *Flores*, 93 Cal.App.4th at 853, 113 Cal.Rptr.2d 376. *See also Armendariz*, 24 Cal.4th at 114, 99 Cal. Rptr.2d 745, 6 P.3d 669; *Blake*, 93 Cal. App.4th at 742, 113 Cal.Rptr.2d 422; *California Grocers Ass'n*, 22 Cal.App.4th at 213, 27 Cal.Rptr.2d 396. Put another way,

---

**14.** In view of the decision herein, I do not consider whether the Legal Remedies Provisions could constitute the effective waiver of other statutory rights guaranteed to the plaintiff class. The California Supreme Court has already ruled that "an arbitration agreement cannot be made to serve as a vehicle for the waiver of statutory rights created by the [California Fair Employment and Housing Act]." *Armendariz*, 24 Cal.4th at 101, 99 Cal.Rptr.2d 745, 6 P.3d 669.

"procedural unconscionability occurs when a party has experienced surprise or oppression due to unequal bargaining power." *Blake*, 93 Cal.App.4th at 742, 113 Cal.Rptr.2d 422. The substantive element of unconscionability "traditionally involves contract terms that are so one-sided as to 'shock the conscience' or that impose harsh or oppressive terms." *Id.* (citing *Armendariz*, 24 Cal.4th at 114, 99 Cal.Rptr.2d 745, 6 P.3d 669). It focuses on "the effects of the contractual terms and whether they are overly harsh or one-sided." *Flores*, 93 Cal.App.4th at 853, 113 Cal.Rptr.2d 376 (citing *A & M Produce Co.*, 135 Cal.App.3d at 487, 186 Cal.Rptr. 114; *Armendariz*, 24 Cal.4th at 114, 118–19, 99 Cal.Rptr.2d 745, 6 P.3d 669). "Substantive unconscionability ... has ... been described as ... the absence of any justification for that result, or 'that a contractual term is substantially suspect if it reallocates the risks of the bargain in an objectively unreasonable or unexpected manner.'" *Allan v. Snow Summit, Inc.*, 51 Cal.App.4th 1358, 1377, 59 Cal.Rptr.2d 813 (1996) (quoting *A & M Produce Co.*, 135 Cal.App.3d at 487, 186 Cal.Rptr. 114). Procedural and substantive unconscionability must both be present in order for a court to find an unconscionable contract or contract provision. *See Armendariz*, 24 Cal.4th at 114, 99 Cal.Rptr.2d 745, 6 P.3d 669 (quoting *Stirlen v. Supercuts*, 51 Cal.App.4th 1519, 1533, 60 Cal.Rptr.2d 138 (1997)). However, the two elements can operate on a sliding scale: a greater finding of one absolves the need for an equal or greater finding of the other. *See id.; Blake*, 93 Cal.App.4th at 743, 113 Cal.Rptr.2d 422.

91. In *Armendariz*, the California Supreme Court concluded that the general state law of unconscionability could be applied to invalidate all or part of an employment arbitration agreement, notwithstanding the strong federal and state policy favoring arbitration as a means of dispute resolution. Citing the Federal Arbitration Act ("FAA"), 9 U.S.C. § 2, and the California Arbitration Act, Cal.Civ.Proc.Code § 1281, the Court stated that "arbitration agreements are valid, irrevocable, and enforceable, **save upon such grounds as exist at law or in equity for the revocation of any contract,** [and] may only be invalidated for the same reasons as other contracts." *Armendariz*, 24 Cal.4th at 98, 99 Cal.Rptr.2d 745, 6 P.3d 669 (emphasis added). *See also Doctor's Assoc. v. Casarotto*, 517 U.S. 681, 686, 116 S.Ct. 1652, 134 L.Ed.2d 902 (1996) (citations) ("[G]enerally applicable contract defenses, such as fraud, duress, or unconscionability, may be applied to invalidate arbitration agreements without contravening [the FAA]."). Therefore, at least with respect to the FAA, an unconscionability analysis of the Legal Remedies Provisions for purposes of determining AT & T's liability under California consumer protection laws is consistent with, and envisioned by, federal law.

### 1. Procedural Unconscionability

■■■■■ 92. An analysis of procedural unconscionability begins with an inquiry into whether the CSA is a contract of adhesion. *See Armendariz*, 24 Cal.4th at 113, 99 Cal.Rptr.2d 745, 6 P.3d 669; *Flores*, 93 Cal.App.4th at 853, 113 Cal. Rptr.2d 376. A contract of adhesion is a standardized contract "imposed upon the subscribing party without an opportunity to negotiate the terms." *Flores*, 93 Cal. App.4th at 853, 113 Cal.Rptr.2d 376. In the case at bar, it is undisputed that the CSA is a contract of adhesion. AT & T unquestionably had superior bargaining strength and presented the CSA as a preprinted document with uniform language drafted and prepared entirely by AT & T. As discussed above, the terms and conditions of the CSA were imposed on the class members without an opportunity for negotiation, modification or waiver. *See supra* ¶¶ 34–36. In other words, the CSA

was presented to the class members on a "take it or leave it" basis.

93. A determination that the CSA is a contract of adhesion, plaintiffs contend, is tantamount to a finding of procedural unconscionability. *See, e.g., Flores,* 93 Cal.App.4th at 853–54, 113 Cal. Rptr.2d 376 ("A finding of a contract of adhesion is essentially a finding of procedural unconscionability ...."). *Accord Stirlen,* 51 Cal.App.4th at 1533, 60 Cal. Rptr.2d 138; *California Grocers Ass'n,* 22 Cal.App.4th at 214, 27 Cal.Rptr.2d 396. *But see Dean Witter Reynolds,* 211 Cal. App.3d at 769, 259 Cal.Rptr. 789 ("[W]e are not prepared to hold that [oppression and adhesiveness] are identical."). AT & T, on the other hand, contends that a finding of adhesion only begins the analysis of procedural unconscionability. Although the case law appears to favor plaintiffs' position that an adhesive contract is procedurally unconscionable, I do not need to base my finding of procedural unconscionability solely on the adhesive nature of the CSA because the elements of oppression and surprise are sufficiently present to satisfy the shifting standard present in a sliding scale analysis.

94. To avoid "oppression," there must be "a meaningful choice of reasonably available alternative sources of supply from which to obtain the desired goods and services **free of the terms claimed to be unconscionable.**" *Dean Witter Reynolds,* 211 Cal.App.3d at 772, 259 Cal.Rptr. 789 (emphasis added). Here, the class members lack of a meaningful choice with respect to the Legal Remedies Provisions

satisfies the "oppression" prong of procedural unconscionability. Residential long distance carriers who service two-thirds of the California market all provide substantially similar dispute resolution provisions which include mandatory arbitration and limitations on damages.[15] Finding a carrier who did not contain such a provision was not easy. *See supra* ¶¶ 37–41. The obstacles were compounded by AT & T's response to those class members who complained about the unfairness of the arbitration provisions. AT & T representatives were instructed not to discuss arbitration, and class members would frequently be directed to a recording or written materials. A class member who specifically complained about the arbitration provision would be sent a written response which stated in part that "[a]ll of the other major long distance carriers have included an arbitration provision in their service agreements." (Pls.' Exs. 177, 186.) AT & T's characterization of the ease with which class members can switch carriers is also misleading. If a class member is dissatisfied with her legal remedies, she may be able to change her service, but she cannot change her choice of legal remedies once the problem that invokes those remedies has occurred. *See* CSA § 4 ("This section will continue to apply after the agreement ends."). Once the problem arises, a class member is locked into the Legal Remedies Provisions in the CSA.

95. The CSA also possessed the "surprise" necessary for a finding of procedural unconscionability. The determination of whether the Legal Remedies Provisions

---

**15.** Verizon, a carrier with 8.8% of the residential long distance market in California, does not require its customers to agree to binding arbitration. It is not clear how "meaningful" a choice Verizon is. A thorough review of Verizon's website revealed no information at all regarding its consumer service agreement, its limitations on liability or the fact that it does not impose on its customers mandatory, binding arbitration. Additionally, it is hard to believe that if AT & T were permitted to limit its legal liability and exposure to legal action, Verizon, submitting to the undisputedly highly competitive demands of the marketplace, would not adopt provisions similar to those of AT & T.

were "hidden in a prolix printed form" loses its importance when AT & T's own research found that only 30% of its customers would actually read the entire CSA and 10% of its customers would not read it at all. AT & T's research also found that 1/4 of the class would not open the separate mailing. Plaintiffs introduced evidence that these numbers were even higher. Even more significant is the fact that a typical consumer did not expect to receive a new contract from AT & T, let alone one which conditioned acceptance on a negative option. Not only are these results consistent with AT & T's overall message of reassurance to its customers, they result directly from that message. Had AT & T wanted to minimize "surprise," it could have delivered a clearer message to its customers. It could have, among other things, advised its customers that the separate mailing contained a new contract, put a similar advisory on the envelope containing the billing mailing and otherwise been more candid and communicative about the limitations it was imposing on a consumer's legal rights and remedies. Instead, AT & T characterized the detariffing process as a non-event, thereby imposing on its customers the artificial notion that they would be unaffected by the changes resulting from detariffing. Under a sliding scale analysis, all this is enough to satisfy the procedural element of unconscionability, given the strong presence of substantive unconscionability in the CSA.

## 2. Substantive Unconscionability

■ 96. As discussed above, to the extent the Legal Remedies Provisions attempt to limit the rights of class members under the CLRA, they are contrary to statute and public policy and are void. *See supra* ¶¶ 87–89. Plaintiffs also challenge the Provisions as substantively unconscionable. As discussed above, substantive unconscionability focuses on the harshness and one-sidedness of a contract's terms

and the effect of those terms. *See supra* ¶ 90.

97. Perhaps most significant are the limitations on liability in the Legal Remedies Provisions. For the same reasons they are illegal, they are also substantively unconscionable.

■ 98. Plaintiffs strongly challenge the CSA's prohibition of class actions in non-CLRA cases. Case law and public policy embrace the importance of class actions as a vital instrumentality of consumer protection. The United States Supreme Court has detailed the substantial advantages a class action procedure may offer:

[I]t may motivate [plaintiffs] to bring cases that for economic reasons might not be brought otherwise, [thereby] vindicating the rights of individuals who otherwise might not consider it worth the candle to embark on litigation in which the optimum result might be more than consumed by the cost .... [T]he financial incentive that class actions offer ... is a natural outgrowth of the increasing reliance on the 'private attorney general' for the vindication of legal rights .... Where it is not economically feasible to obtain relief within the traditional framework of a multiplicity of small individual suits for damages, aggrieved persons may be without any effective redress unless they may employ the class-action device.

*Deposit Guar. Nat'l Bank v. Roper,* 445 U.S. 326, 338–39, 100 S.Ct. 1166, 63 L.Ed.2d 427 (1980). *See also Ortiz v. Fibreboard Corp.,* 527 U.S. 815, 860, 119 S.Ct. 2295, 144 L.Ed.2d 715 (1999) ("One great advantage of class action treatment ... is the opportunity to save the enormous transaction costs of piecemeal litigation ...."); *Gulf Oil Co. v. Bernard,* 452 U.S. 89, 99, 101 S.Ct. 2193, 68 L.Ed.2d 693 (1981) ("Class actions serve an important function in our system of civil justice.").

The California Supreme Court is of the same view. *See Linder v. Thrifty Oil Co.,* 23 Cal.4th 429, 445, 97 Cal.Rptr.2d 179, 2 P.3d 27 (2000) ("[C]lass actions offer consumers a means of recovery for modest individual damages . . . ."); *Vasquez v. Superior Court,* 4 Cal.3d 800, 808, 94 Cal. Rptr. 796, 484 P.2d 964 (1971) ("Individual actions by each of the defrauded consumers is often impracticable because the amount of individual recovery would be insufficient to justify bringing a separate action . . . .").

99. As discussed above, the prohibition on class actions will prevent class members from effectively vindicating their rights in certain categories of claims, especially those involving practices applicable to all members of the class but as to which any consumer has so little at stake that she cannot be expected to pursue her claim. *See supra* ¶¶ 64–66, 71. This ban on class actions is exacerbated by many of the other restrictions in the Legal Remedies Provisions, such as the limitations on damages and the confidentiality provision.

100. The ban is effectively one-sided since it is hard to conceive of a class action suit that AT & T would file against its customers. And the only justification advanced for it, that it will limit AT & T's cost of litigation,[16] is insufficient to over-

come numerous determinations by legislators and courts, noted above, that class action treatment offers the public a vehicle for vindicating legal rights when individual claims are not economically feasible. For all these reasons, the ban on class actions is substantively unconscionable.[17]

◼ 101. Plaintiffs next challenge the confidentiality provision of Section 7, which reads:

> Any arbitration shall remain confidential. Neither you nor AT & T may disclose the existence, content or results of any arbitration or award, except as may be required by law or to confirm and enforce an award.

CSA § 7(b).

102. Read literally, this provision is rather draconian. Once a claim enters arbitration a class member may not talk about the claim to anyone, except as may be required by law or to confirm or enforce an award. This serves to prevent, among many other examples, a class member from talking to family members about a problem that may involve them all, a class member from talking to a neighbor or co-worker that may have a similar problem or a class member from complaining

---

16. AT & T has suggested that if its costs are lower, it can charge less. It presented no evidence that the Legal Remedies Provisions would produce lower charges. In fact, the FCC has concluded that "requiring nondominant interexchange carriers to conduct their businesses as do other businesses in unregulated markets will not substantially increase their costs." *Order on Reconsideration,* 12 F.C.C.R. 15,014, § 15. Nor am I prepared to make that assumption, since while lower costs can produce lower charges, they can also produce higher profits. In any event, the notion that it is to the public's advantage that companies be relieved of legal liability for their wrongdoing so that they can lower their cost of doing business is contrary to a century of consumer protection laws. *See generally A*

& M Produce Co., 135 Cal.App.3d at 491–92, 186 Cal.Rptr. 114 (citing *Escola v. Coca Cola Bottling Co.,* 24 Cal.2d 453, 462, 150 P.2d 436 (1944) (Traynor, J., concurring); *Rodgers v. Kemper Constr. Co.,* 50 Cal.App.3d 608, 618, 124 Cal.Rptr. 143 (1975); Holmes, The Common Law 117 (1881))("From a social perspective, risk of loss is most appropriately borne by the party best able to prevent its occurrence.").

17. AT & T argues that plaintiffs still have the ability to obtain classwide relief from the FCC. However, the FCC is not a forum in which one or a group of class members can effectively vindicate many of their rights in a variety of contexts. *See supra* ¶¶ 68–71.

to an elected official about the fairness of the arbitration.

103. The implications of such secrecy to society are troubling. Among many others, they mean that if consumers obtain determinations that a particular AT & T practice is unlawful, they are prohibited from alerting other consumers. Since the AAA does not require the arbitrator to state reasons for the award and does not provide a public record of arbitrator rulings, this confidentiality provision means that a contract that affects seven million Californians will be interpreted largely without public scrutiny. This puts AT & T in a vastly superior legal posture since as a party to every arbitration it will know every result and be able to guide itself and take legal positions accordingly, while each class member will have to operate in isolation and largely in the dark.[18]

104. AT & T seeks to distance itself from the dark side of its confidentiality provision in several ways. First it argues that the provision should not be read literally since it was not intended to prohibit many of the sorts of communications mentioned above. One AT & T witness even testified that he was familiar with confidentiality agreements of the sort that often apply to expert witnesses and he never thought they were meant to prevent his talking to friends and co-workers. The problem is that for purposes of determining its legality, I cannot assume that the class will not read the provision literally but will disregard its plain words as this expert would.

105. AT & T next claims that the harsh results discussed above are all mitigated by the phrase "except as may be required by law." Read literally, AT & T's argument fails since none of the communications mentioned above are "required by law."[19] Alternatively, AT & T contends that this provision merely mirrors the confidentiality provision in the FCC rules for arbitrations conducted under the aegis of the FCC. See 47 C.F.R. § 1.18(b) (2001). The difficulty with AT & T's position is that the provision in the ADRA, the statute upon which the FCC rule relies, permits claimants to disclose much information about the arbitration, including any information that originates with the claimant. See 5 U.S.C. § 574(b) (1996 & Supp. 2001). It does not require disclosure. A disclosure permitted by the ADRA is not one "required by law." A contrary conclusion is certainly not one I would expect the ordinary consumer to reach. And as mild as the ADRA confidentiality provision is, it is entirely voluntary, See id. § 575(a)(1)("Arbitration may be used as an alternative means of dispute resolution whenever all parties consent."), and can never be imposed in a contract, precisely what AT & T is attempting to do here. See id. § 575(a)(3)("An agency may not require any person to consent to arbitration as a condition of entering into a contract or obtaining a benefit.").

106. At trial, AT & T contended that the purposes of this provision were to protect consumer privacy, such as in a dispute about phone charges to a pornographic

---

**18.** See Llewellyn Joseph Gibbons, *Private Law, Public "Justice": Another Look at Privacy, Arbitration, and Global E–Commerce,* Ohio St. J. on Disp. Resol. 769, 786–87 (2000) ("The institutional repeat player ... will quickly have access to a variety of arbitral awards ... that can be used ... to argue for or against any position the repeat player chooses to take in each arbitration. The one-shot player has no such arsenal of arbitral awards to choose

from to cite as precedent for her position on interpreting the contract.").

**19.** There appears to be little law interpreting this phrase. In this court, it appears frequently in confidentiality provisions in settlement agreements and is generally interpreted to mean that the confidential terms can only be disclosed in response to a court order or other specific legal obligation.

service, and to discourage copycat lawsuits. Whatever merit there is in this position, the scope of AT & T's provision is far too broad. All reasonable expectations about privacy can be resolved by entering into a confidentiality agreement tailored to a specific claim. And, the confidentiality provision extends to all "copycat lawsuits," even those which are meritorious and where there is a public purpose to be served by alerting consumers to a particular problem. This provision is so one-sided, oppressive and devoid of justification as to be substantively unconscionable.

107. Plaintiffs also argue that the two year limitation period in the Legal Remedies Provisions is substantively unconscionable. Whereas this clause may be illegal as applied to plaintiffs' statutory rights under the CLRA, it is not substantively unconscionable when applied to non-statutory claims. *See Soltani v. Western & Southern Life Ins. Co.,* 258 F.3d 1038, 1043–45 (9th Cir.2001) ("Many California cases have upheld contractual shortening of statutes of limitations in different types of contracts ...."); *Han v. Mobil Oil Corp.,* 73 F.3d 872, 877 (9th Cir.1995) ("California permits contracting parties to agree upon a shorter limitations period for bringing an action than prescribed by statute, so long as the time allowed is reasonable."). The United States Supreme Court has also upheld such clauses, finding that:

> In the absence of a controlling statute to the contrary, a provision in a contract may validly limit, between the parties, the time for bringing an action on such contract to a period less than that prescribed in the general statute of limitations provided that the shorter period itself shall be a reasonable period.

*Order of United Commercial Travelers v. Wolfe,* 331 U.S. 586, 608, 67 S.Ct. 1355, 91 L.Ed. 1687 (1947).

108. Finally, plaintiffs contend that the Legal Remedies Provisions are unconscionable because of the financial obstacles they place in the path of a class member. The Legal Remedies Provisions apply to both statutory and non-statutory claims. Most of the cases which have considered the financial implications of mandatory arbitration schemes have done so in the context of determining whether they prevent a claimant from effectively vindicating statutory rights. *See Green Tree Financial Corp. v. Randolph,* 531 U.S. 79, 90, 121 S.Ct. 513, 148 L.Ed.2d 373 (2000); *Williams v. Cigna Financial Advisors,* 197 F.3d 752, 763–64 (5th Cir.1999), *cert. denied,* 529 U.S. 1099, 120 S.Ct. 1833, 146 L.Ed.2d 777 (2000); *Paladino v. Avnet Computer Tech., Inc.,* 134 F.3d 1054, 1062 (11th Cir.1998)(Cox, J., concurring); *Luong v. Circuit City Stores, Inc.,* 2001 WL 935317, at *6 (C.D.Cal. Mar. 28, 2001). It is hard to conceive of how an adhesive contractual provision which prevents someone from effectively vindicating her non-statutory legal rights would not be substantively unconscionable, so I will apply one analysis to both statutory and non-statutory claims. *See generally Sosa v. Paulos,* 924 P.2d 357, 362 (Utah 1996).

109. In *Green Tree Financial Corp.,* the United States Supreme Court recognized that:

> It may well be that the existence of large arbitration costs could preclude a litigant such as Randolph from effectively vindicating her federal statutory rights in the arbitral forum.

531 U.S. at 90, 121 S.Ct. 513. Because there was no evidence in the record regarding the costs of arbitration, the Supreme Court refused to invalidate the arbitration agreement based on speculation that the plaintiff would be "saddled with prohibitive costs." *Id.* at 91, 121 S.Ct. 513.

110. Here, the Legal Remedies Provisions provide that if a class member has a claim for under $1000 and is willing to

have the dispute resolved by a review of documents, the class member will pay a $20 filing fee and AT & T will pay all other fees and costs associated with the arbitration. However, it is unlikely there will be many such arbitrations. *See supra* ¶ 62. Arbitration involving any disputes over $10,000, or arbitration that is conducted in person, is governed by the AAA's Commercial Rules. The CSA provides no other information about the costs of arbitration other than mailing and Internet addresses at which a class member can obtain further information about AAA rules and fees.

111. Plaintiffs introduced substantial evidence of the costs of arbitration, much of it gleaned from discovery obtained from AAA and much of it not available to class members when they received the CSA.[20] Based on plaintiffs' showing, it is apparent that in a number of situations, large arbitration costs will preclude class members from effectively vindicating their legal rights. In *Armendariz*, the California Supreme Court stated:

> Our holding in *California Teachers Assn.* serves to confirm the principle inherent in *Cole* that statutory or constitutional rights may be transgressed as much by the imposition of undue costs as by outright denial .... Accordingly ... the arbitration agreement or arbitration process cannot generally require the [plaintiff] to bear any **type** of expense that [she] would not be required to bear if [she] were free to bring the action in court.

*Armendariz*, 24 Cal.4th at 109–111, 99 Cal. Rptr.2d 745, 6 P.3d 669 (emphasis in original). For example, a class member who believes she has been the victim of discrimination, of illegal credit reporting practices, or of "slamming," and who seeks $25,000 in damages, would have to pay, for a two day arbitration, a $750 filing fee as soon as she files her claim, (J. Ex. 16–25), and might have to deposit approximately $1900 in arbitrator's fees (based on half of the $1899 average daily rate of arbitrator compensation in Northern California), (J. Ex. 16–19), for a total of $2650 before the arbitration begins. If her claim sought $100,000 and the arbitration was scheduled for four days, the initial filing fee would be $1250, (J. Ex. 16–25), there would be an extra case service fee of $750, (*see id.*), and there could be an arbitrator's fee deposit of $3800. Thus, a class member's potential cost before arbitration begins would be $5800. Filing that suit in a court, which she supports with her taxes, would generally cost her under $200 in California. Having to advance such substantial sums will deter many litigants from proceeding. *See, e.g., Phillips v. Associates Home Equity Serv.*, 2001 WL 1159216, at \*5 (N.D.Ill. Sept.28, 2001)(refusing to compel arbitration of TILA claims arising out of a $72,900 mortgage when claimant was required to pay over $4000 in fees).

112. The arbitrator's authority to alter the allocation of the costs of arbitration at the conclusion of the case does little to mitigate the cost of "buying into" arbitration. *See id.* Neither does the AAA's policy of occasionally deferring some of its, but not the arbitrator's, fees in cases of extreme hardship. *See supra* ¶¶ 59–61. Unlike other companies who have recognized this problem by providing for the advancement of plaintiffs' costs or the capping of such costs in their arbitration agreements, thereby resulting in court approval, *see, e.g., Luong*, 2001 WL 935317, at \*5 (upholding arbitration agreement which required defendant to advance a

---

20. A search of the AAA website adr.org disclosed AAA's fees but no information about typical arbitrators' fees. A search of the AT & T website identified in the Legal Remedies Provisions yielded no information about any fees or costs.

majority of the arbitration's costs and imposed a limit on plaintiff's payment of defendant's costs should defendant prevail), AT & T has chosen not to limit the plaintiffs' costs of arbitration in a meaningful fashion.

113. The inhibiting effects of imposing AAA fees on a class member are magnified by the other limitations in the Legal Remedies Provisions. Because AT & T has severely limited the damages a successful plaintiff may obtain and has prohibited the joinder of claims and the use of class actions, it has eliminated other incentives to litigants and potential counsel which might mitigate the harsh effects of the arbitration fees. As noted above, the undisputed testimony was that AT & T has created a legal environment in which even seemingly meritorious claims, such as those which have been successfully prosecuted against AT & T and have resulted in substantial recoveries, would no longer be prosecuted. *See supra* ¶¶ 63–66.

114. Having found that certain of the Legal Remedies Provisions are illegal and unconscionable under state law, I now turn to the severability of the Legal Remedies Provisions. The CSA contains a severability clause which states "[i]f any part of this Agreement is found invalid, the rest of the Agreement will remain valid and enforceable." CSA § 8(e). It further states that "[i]f any portion of this Dispute Resolution Section is determined to be unenforceable, then the remainder shall be given full force and effect." *Id.* § 7(a). In *Armendariz,* after examining the basic principles inherent in Cal. Civ.Code § 1599 and the case law of illegal contracts, the Supreme Court applied the doctrine of severability to a finding of unconscionability of the arbitration agreement before it:

> If the central purpose of the contract is tainted with illegality, then the contract as a whole cannot be enforced. If the illegality is collateral to the main purpose of the contract, and the illegal provision can be extirpated from the contract by means of severance or restriction, then such severance and restriction are appropriate.

*Armendariz,* 24 Cal.4th at 124, 99 Cal. Rptr.2d 745, 6 P.3d 669.[21] *See also Birbrower, Montalbano, Condon & Frank, P.C. v. Superior Court,* 17 Cal.4th 119, 138, 70 Cal.Rptr.2d 304, 949 P.2d 1 (1998). In *Armendariz,* the Court found that the only effective way to sever the multiple unlawful provisions that permeated the arbitration agreement would be to reform the contract by augmenting its terms. Because a court lacks the power to do this, it refused to enforce the entire agreement. *See Armendariz,* 24 Cal.4th at 124–25, 99 Cal.Rptr.2d 745, 6 P.3d 669.

115. The Legal Remedies Provisions contain many unlawful or unconscionable clauses. While some, such as the ban on class actions, are easily severable, others, such as the limitations on liability and the allocation of arbitration costs, can only be remedied by substantially rewriting the contract. This is not a proper court function. *See id.* at 125, 99 Cal.Rptr.2d 745, 6 P.3d 669 (citing *Kolani v. Gluska,* 64 Cal. App.4th at 407–08, 75 Cal.Rptr.2d 257)(the power to reform is limited to instances in which parties make mistakes, not to correct illegal provisions). In addition, these provisions often intertwine to advance AT & T's overriding purpose of deterring liti-

---

**21.** Although the California Supreme Court was addressing a § 1670.5 defense of unconscionability, this rationale would apply equally to a § 1770(a)(19) action for unconscionability under the CLRA, given the aforementioned statutory scheme and body of case law providing for an affirmative cause of action for unconscionability and the resulting remedy of voiding those provisions found to be unconscionable under the CLRA. *See supra* ¶¶ 74–77.

gation. As in *Armendariz*, the presence of "[s]uch multiple defects indicate a systematic effort to impose arbitration on [a class member] not simply as an alternative to litigation, but as an inferior forum that works to [AT & T's] advantage." *Id.* at 124, 99 Cal.Rptr.2d 745, 6 P.3d 669. Under the circumstances I conclude that the Legal Remedies Provisions as a whole are so permeated with unconscionability and illegality that they cannot be saved or reformed. However, the CSA does have a valid legal purpose of governing the relationship between AT & T and the class members. Inclusion of the Legal Remedies Provisions is not essential to the CSA, since in their absence the parties' legal rights are governed by existing law. Therefore I find that the Legal Remedies Provisions are severable from the CSA.

## J. PREEMPTION UNDER THE FCA

116. AT & T primarily defends against plaintiffs' state law claims by arguing that the FCA preempts any application of state contract and consumer protection laws to the CSA's rates, terms and conditions.[22] According to AT & T, sections 201(b) and 202 of the FCA exclusively govern the rates, terms and conditions of interstate long distance telephone service. AT & T argues that the Legal Remedies Provisions constitute such rates, terms and conditions specifically referred to in the FCA, and therefore any challenge to their lawfulness or reasonableness should be decided under federal law. Because plaintiffs have focused their arguments on state law and not under federal law, AT & T argues that it should prevail if I decide that the CSA's terms are governed by federal law.

117. The FCA can preempt plaintiffs' state law claims expressly through its plain language, or impliedly.

Express preemption occurs when a federal statute expressly directs that state law be ousted to some degree from a certain field. *See Jones v. Rath Packing Co.,* 430 U.S. 519, 525, 97 S.Ct. 1305, 51 L.Ed.2d 604 (1977). Here both parties agree that the terms of the FCA do not expressly preempt state consumer protection laws. AT & T argues, however, that the FCA impliedly preempts state law. As the Supreme Court recently explained,

> [A] federal statute implicitly overrides state law either when the scope of a statute indicates that Congress intended federal law to occupy a field exclusively, . . . or when state law is in actual conflict with federal law. We have found implied conflict pre-emption where it is impossible for a private party to comply with both state and federal requirements, . . . or where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.

*Freightliner Corp. v. Myrick,* 514 U.S. 280, 287, 115 S.Ct. 1483, 131 L.Ed.2d 385 (1995) (internal citations omitted). *See also Michigan Canners & Freezers Ass'n v. Agricultural Marketing & Bargaining Bd.,* 467 U.S. 461, 469, 104 S.Ct. 2518, 81 L.Ed.2d 399 (1984) (conflict preemption); *Campbell v. Hussey,* 368 U.S. 297, 300–02, 82 S.Ct. 327, 7 L.Ed.2d 299 (1961) (field preemption). Under any preemption analysis, the party arguing for preemption must provide clear evidence of Congress' intent to preempt state law because "the historic police powers of the States [are] not to be superseded by [a] Federal Act unless that was the clear and manifest purpose of Congress." *Medtronic v. Lohr,* 518 U.S. 470, 485, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996) (citations omitted). This is crucial if a party is to satisfy the

---

**22.** The Attorneys General of eleven states have filed an amicus curiae brief contending that the FCA does not preempt the state consumer protection laws at issue here.

heavy burden of overcoming the "presum[ption] that Congress does not cavalierly pre-empt state-law causes of action." *Id. See also Jones*, 430 U.S. at 525, 97 S.Ct. 1305 ("This [presumption] provides assurance that 'the federal-state balance,' will not be disturbed unintentionally by Congress or unnecessarily by the courts.") (citation omitted). To support its position, AT & T relies on the case law interpreting the filed rate doctrine as applied to the Interstate Commerce Act ("ICA") and the FCA and the FCC's detariffing order and the circumstances surrounding its implementation.[23]

118. AT & T relies heavily on the proposition, first discussed in *Texas & Pac. Ry. Co. v. Abilene Cotton Oil Co.*, 204 U.S. 426, 27 S.Ct. 350, 51 L.Ed. 553 (1907) and recently reiterated in *AT & T v. Central Office Telephone, Inc.*, 524 U.S. 214, 118 S.Ct. 1956, 141 L.Ed.2d 222 (1998), that the filed rate requirements of both the ICA and the FCA implicitly preempt any state law claims challenging the rates, terms and conditions listed in those filed tariffs. In *Texas & Pac. Ry.*, the Supreme Court concluded that a shipper seeking damages under the ICA based upon the alleged unreasonableness of rates charged by a common carrier must do so through the Interstate Commerce Commission, not the courts, because it alone "is vested with power originally to entertain proceedings for the alteration of an established schedule...." *Texas & Pac. Ry.*, 204 U.S. at 448, 27 S.Ct. 350. Over 90 years later, the Court applied the "filed rate" doctrine to bar breach of contract and tortious interference claims relating to a service governed by a tariff filed with the FCC. *See AT & T v. Central Office Telephone, Inc.*,

524 U.S. at 226, 118 S.Ct. 1956. The Court emphasized that the purpose of the filed rate doctrine was to prevent carriers from engaging in unjust discrimination and from providing undue preferences to some customers. "It is that antidiscriminatory policy which lies at 'the heart of the common-carrier section of the Communications Act.'". *See AT & T v. Central Office Telephone, Inc.*, 524 U.S. at 223, 118 S.Ct. 1956 (quoting *MCI Telecommunications Corp. v. AT & T*, 512 U.S. 218, 229, 114 S.Ct. 2223, 129 L.Ed.2d 182 (1994)).

119. In light of the clear purpose of the filed rate doctrine, AT & T's reliance on these cases is misplaced. In interpreting Congress' intent, the Supreme Court was concerned with the potential for carriers charging discriminatory rates to, or imposing discriminatory terms on, their customers, not with whether their customers were able to resolve disputes before a court or an arbitrator, or whether their customers were able to file a class action on the other matters here in dispute.

120. Defendant's cases are distinguishable on a number of other grounds as well, the most obvious being that the Court decided them both before the FCC exercised its forbearance authority under the Telecommunications Act of 1996 to end the practice of setting rates, terms and conditions through tariffs filed with the FCC. Both decisions explicitly and undisputably addressed rates and charges that had already been filed as tariffs. *See Texas & Pac. Ry.*, 204 U.S. at 434, 27 S.Ct. 350; *AT & T v. Central Office Telephone, Inc.*, 524 U.S. at 225, 118 S.Ct. 1956 (services at issue "pertain[ed] to subjects that [were] **specifically addressed** by the filed tariff

---

**23.** Reduced to its essence, AT & T argues that in passing the FCA, Congress intended to preempt state law to ensure telephone "service on uniform rates, terms, and conditions throughout the nation." (Def.'s Trial Br. at 14, ln. 8.) It is ironic that AT & T makes this argument in an effort to impose mandatory arbitration since it is hard to see how the goal of uniformity is advanced if the rates, terms, and conditions of service are being judged by arbitrators making unreported and largely unreviewable decisions.

...."")(emphasis in original). In marked contrast, the Legal Remedies Provisions of the CSA have never been filed with the FCC as part of a tariff and could not be filed after detariffing.

■ 121. This does not mean that the rates, terms and conditions of residential long distance telephone service are no longer governed by Sections 201(b) and 202 of the FCA. Instead, it simply means that the issues of contract formation, illegality and unconscionability presented here are not questions relating to whether carriers will be unjustly discriminatory as to the rates, terms and conditions of service such that there is a need for implied preemption.[24]

122. This is consistent with the position taken by the FCC in response to a petition for reconsideration filed by AT & T and other carriers in which AT & T sought to resolve what it thought was an ambiguity in the Commission's position on whether the FCA would continue to govern the reasonableness of rates, terms and conditions of interstate service in a detariffed environment. The FCC responded by stating that:

> The [FCA] continues to govern determinations as to whether rates, terms and conditions for interstate ... services are just and reasonable, and are not unjustly or unreasonably discriminatory ....

*Order on Reconsideration,* 12 F.C.C.R. 15,014 at ¶ 77. The FCC went on to emphasize that "the [FCA] does not govern other issues, such as contract formation and breach of contract, that arise in a detariffed environment." *Id.* As evidenced by the legislative history and the series of notices and orders surrounding the detariffing decision, Congress and the FCC consistently manifested the intent to allow state law to govern consumer rights and

the inevitable formation of a new legal relationship between AT & T and its customers in the wake of a detariffed environment. For example, the FCC repeatedly stated that the absence of filed tariffs and the abolition of the filed rate doctrine would result in a "legal relationship between carriers and customers ... more closely resembl[ing] the legal relationship between service providers and customers in an unregulated environment." *Second Report and Order,* 11 F.C.C.R. 20,730 at ¶ 55. *See also supra* ¶¶ 8–9. After its detariffing order was implemented on August 1, 2001, the FCC informed customers on its website that although companies no longer have to file tariffs with the FCC, customers will be "protected by the full range of state laws, including those governing contract, consumer protection, and deceptive practices ..." and "state contract law determines what constitutes an agreement between you and your long distance company." (*Supra* ¶ 11.) Against this backdrop, I cannot conclude that the legality of the Legal Remedies Provisions in a service contract that would not have existed prior to detariffing should now be decided as if detariffing, the event that gave rise to the CSA in the first place, had never occurred.

## CONCLUSION

This lawsuit is not about arbitration. If all AT & T had done was to move customer disputes that survive its informal resolution process from the courts to arbitration, its actions would likely have been sanctioned by the state and federal policies favoring arbitration. While that is what it suggested it was doing to its customers, it was actually doing much more; it was actually rewriting substantially the legal landscape on which its customers must contend. Aware that the vast majority of

---

**24.** The precise scope of FCA preemption in a detariffed environment will be defined as rates, terms or conditions of service are challenged.

service related disputes would be resolved informally, AT & T sought to shield itself from liability in the remaining disputes by imposing Legal Remedies Provisions that eliminate class actions, sharply curtail damages in cases of misrepresentation, fraud, and other intentional torts, cloak the arbitration process with secrecy and place significant financial hurdles in the path of a potential litigant. It is not just that AT & T wants to litigate in the forum of its choice—arbitration; it is that AT & T wants to make it very difficult for anyone to effectively vindicate her rights, even in that forum. That is illegal and unconscionable and must be enjoined.

## AT&T Consumer Services Agreement

**THANK YOU FOR USING AT&T SERVICES.** In this Agreement ("Agreement"), "you" and "your" mean the customer of the AT&T services defined below, and "AT&T," "we," "our," and "us" mean AT&T Corp., Alascom, Inc. and any AT&T affiliates authorized to provide you with AT&T services.

**BY ENROLLING IN, USING, OR PAYING FOR THE SERVICES, YOU AGREE TO THE PRICES, CHARGES, TERMS AND CONDITIONS IN THIS AGREEMENT. IF YOU DO NOT AGREE TO THESE PRICES, CHARGES, TERMS AND CONDITIONS, DO NOT USE THE SERVICES, AND CANCEL THE SERVICES IMMEDIATELY BY CALLING AT&T AT 1 888 288-4099. FOR FURTHER DIRECTIONS.**

"Service" or "Services" means: (1) the AT&T state-to-state and international consumer telecommunications services you are enrolled in, use, or pay for that AT&T provided to you under tariffs filed with the Federal Communications Commission as of July 31, 2001; and (2) any new or additional AT&T state-to-state and international consumer telecommunications services that you enroll in, use, or pay for, after July 31, 2001.

This Agreement does not cover AT&T local services, AT&T in-state long distance services, calls made by dialing 10-10-345, AT&T Wireless Services, AT&T Internet services, and AT&T video services. The Services covered in this Agreement are subject to billing availability and may not be available at all locations.

"AT&T Service Guides" contain the specific prices and charges, service descriptions, and other terms and conditions not set forth here that apply to each of your Services. You can review the AT&T Service Guides on our Web site at www.att.com/servicequide/home, or request a copy of the AT&T Service Guides for the Services you are enrolled in, by calling AT&T toll free at 1 888 288-4099. **THIS AGREEMENT INCORPORATES BY REFERENCE THE PRICES, CHARGES, TERMS AND CONDITIONS INCLUDED IN THE AT&T SERVICE GUIDES.**

### 1. CHARGES AND PAYMENT.

**a.** General. You agree to pay us for the Services at the prices and charges listed in the AT&T Service Guides. The prices and charges for any particular call may depend on a number of factors listed in the AT&T Service Guides, which include, for example, the duration of a call, the time of day and day of week, the distance called, and the type of service. Service types include, for example, direct-dialed from home, operator-assisted, or calling card calls. The prices and charges for the Services may also include, for example, monthly fees, monthly minimums, or connection charges.

**b.** Price Changes. We may change the prices and charges for the Services from time to time. We may decrease prices without providing advance notice. Increases to the prices or charges for the Services are effective no sooner than fifteen days after we post them on our Web site at www.att.com/servicequide/home. Increases to charges that recover our costs associated with government programs are effective no sooner than three days after we post the increases on our Web site (excluding taxes and surcharges under Section 1.e.). We will provide further notices of increases to the prices and charges as follows. For the Services covering direct-dialed calls from home under the state-to-state basic schedule and the state-to-state and international calling plans, we will (1) notify you of these increases by bill message or other notice; and (2) make available in advance recorded announcements of these price increases These recordings can be obtained by calling AT&T toll free at 1 888 288-4099, 24 hours a day, seven days a week, and will be updated on the first and fifteenth day of each month.

For the following types of calls, we will provide you the prices and charges if you request this information at the time you make a call (or at the time you receive a collect call): AT&T Calling Card calls; AT&T collect calls; AT&T person-to-person calls; calls made with a commercial credit card or local

**= AT&T**

©2001 AT&T. All Rights Reserved ⊕ Printed on recycled paper

BO238

6

---

**e.** Separability. If any part of this Agreement is found invalid, the rest of the Agreement will remain valid and enforceable.

**f.** Governing Law. This Agreement will be governed by the law of the State of New York, without regard to its choice of law rules, except that the arbitration provisions in Section 7 will be governed by the Federal Arbitration Act. This governing law provision applies no matter where you reside, or where you use or pay for the Services.

**g.** Entire Agreement. This Agreement (which incorporates by reference the AT&T Service Guides) constitutes the entire agreement between us and supersedes all prior agreements, understandings, statements or proposals, and representations, whether written or oral This Agreement can be amended only as provided in Section 9 below. No written or oral statement, advertisement, or service description not expressly contained in this Agreement will be allowed to contradict, explain, or supplement it. Neither you nor AT&T is relying on any representations or statements by the other party or any other person that are not included in this Agreement.

### 9. CHANGES TO THIS AGREEMENT.

This Agreement may only be changed in the manner provided for in this Section 9.

We may change this Agreement, including the incorporated AT&T Service Guides, from time to time. If we make any changes to the prices or charges, we will comply with our notice commitments described in Section 1 of this Agreement. With respect to all other changes to this Agreement, we will notify you of the changes, and they will be effective no sooner than fifteen days after we post them at www.att.com/servicequide/home. You may also request a copy of the revised Agreement, including revised AT&T Service Guides for the Services you are enrolled in, by calling AT&T toll free at 1 888 288-4099.

**IF YOU CONTINUE TO BE ENROLLED IN, USE, OR PAY FOR THE SERVICES AFTER ANY CHANGES IN THE PRICES, CHARGES, TERMS OR CONDITIONS, YOU AGREE TO THE CHANGES.**

### 10. ENROLLMENT IN ANOTHER AT&T SERVICE.

To enroll in an additional Service, or to switch from your existing Service to a different Service, you must notify us by: (1) returning an enrollment form provided in AT&T marketing materials; or (2) calling the AT&T customer service number on your AT&T bill; (3) calling the AT&T customer service number provided in AT&T marketing materials; or (4) going to our Web site at www.att.com and following any further instructions provided for enrollment. The terms and conditions of this Agreement, including those in the incorporated AT&T Service Guides, will apply to the new or additional AT&T Service.

**BY ENROLLING IN, USING, OR PAYING FOR THESE NEW OR ADDITIONAL SERVICES, YOU AGREE TO THE PRICES, CHARGES, TERMS AND CONDITIONS IN THIS AGREEMENT.**

*Customers outside the US call: 1 877 288-4725.
TTY for customers with hearing/speech disabilities: 1 800 833-3232.

---

**e** must first attempt to resolve it by contacting you. If the dispute cannot be satisfactorily resolved within sixty days from the date you or AT&T is notified by the other of a dispute, then either party may then contact the AAA in writing at: AAA Service Center, 13455 Noel Road, Suite 1750, Dallas, Texas 75240-6620 and request arbitration of the dispute. Information about the arbitration process and the AAA's arbitration Rules and its fees are available from the AAA on the Internet at: www.adr.org or by contacting us at: www.att.com/servicequidelforms or AT&T, P.O Box 944078, Maitland, Florida 32794-4078. The arbitration will be based only on the written submissions of the parties and the documents submitted to the AAA relating to the dispute, unless either party requests that the arbitration be conducted using the AAA's telephonic, online, or in person procedures. Additional charges may apply for these procedures. Any in person arbitration will be conducted at a location that the AAA selects in the state of your primary residence. Any arbitration shall remain confidential. Neither you nor AT&T may disclose the existence, content, or results of any arbitration or award, except as may be required by law, or to confirm and enforce an award.

**ANY CLAIM OR DISPUTE ARISING OUT OF OR RELATING TO THIS AGREEMENT MUST BE BROUGHT WITHIN TWO YEARS AFTER THE DATE THE BASIS FOR THE CLAIM OR DISPUTE FIRST ARISES.**

Fees and Expenses of Arbitration. You must pay the applicable AAA filing fee when you submit your written request for arbitration to the AAA The AAA's filing fee and administrative expenses for a document arbitration will be allocated according to the AAA's Rules, except that for claims of less than $1,000, you will only be obligated to pay a filing fee of $20 and we will pay all of the AAA's other costs and fees. If you elect an arbitration process other than a document (or "desk") arbitration, you must pay your allocated share of any higher administrative fees and costs for the process you select. Unless applicable substantive law provides otherwise, each party will pay its own expenses for witnesses, document production, and presentation of evidence. The prevailing party may, however, seek to recover the AAA's fees and the expenses of the arbitrator from the other party.

### 8. MISCELLANEOUS.

**a.** No Third Party Rights. This Agreement does not provide any third party with a remedy, claim, or right of reimbursement.

**b.** Acts Beyond Our Control. Neither you nor we will be responsible to the other for any delay, failure in performance, loss or damage due to fire, explosion, power blackout, earthquake, volcanic action, flood, the weather elements, strike, embargo, labor disputes, civil or military authority, war, acts of God, acts or omissions of carriers or suppliers, acts of regulatory or governmental agencies, or other causes beyond our reasonable control, except that you must pay for any Services used.

**c.** Assignment. We can assign all or part of our rights or duties under this Agreement without notifying you If we do that, we have no further obligations to you. You may not assign this Agreement, or the Services without our prior written consent.

**d.** Notices. Notices from you to AT&T must be provided as specified in this Agreement. Notice from you to AT&T made by calling AT&T is effective as of the date that our records show that we received your call. AT&T's notice to you under this Agreement will be provided by one or more of the following: posting on our Web site, recorded announcement, bill message, bill insert, newspaper ad, postcard, letter, call to your billed telephone number, or e-mail to an address provided by you.

BO238

phone company calling card, calls billed to a third party and other types of operator-assisted calls.

c. Payments. You must pay all bills or invoices on time (on or before the due date) and in US money. We do not waive our right to collect the full amount due if you pay late or you pay part of the bill, even if you write the words "Paid in Full" (or similar words) on any correspondence to us.

If you make any late payments and we bill you for the Services, we will charge you a late fee of 1.5%, which we apply to that period's charges and any outstanding charges and late payment charges that remain unpaid at the time of the next bill. If the state law where you receive the Services requires a different rate, we will apply that rate. If a local telephone company or other entity bills you for the Services on our behalf, that company's late payment charges and policies will apply.

If your check, bank draft, or electronic funds transfer is returned for insufficient funds, and we bill you for the Services, we will charge you an additional $15. If the state law where you receive the Services requires a different fee, we will charge you that amount. If a local telephone company or other entity bills you for the Services on our behalf, that company's returned check charge and policy will apply. When payment is made by credit card payment will also be subject to terms and conditions required by the credit card issuer.

d. Charges and Billing. Charges accrue through a full billing period. We may prorate or adjust a bill if the billing period covers less than or more than a full month (for this purpose, each month is considered to have 30 days). To determine the charge for each call, we round up to the next full minute for any fraction of minutes used. We will determine the format of the bill and the billing period, and we may change both the bill format and the billing period from time to time.

You are responsible for preventing the unauthorized use of the Services, and you are responsible for payment for any such unauthorized use.

e. Taxes and Other Charges. You must pay all taxes, fees, surcharges, and other charges that we bill you for the Services, unless you can show documentation satisfactory to us that you are exempt. Taxes and surcharges will be in the amounts that federal, state, and local authorities require us to bill you. We will not provide advance notice of changes to taxes and surcharges, except as required by applicable law.

f. Credit Check and Deposits. You give us permission to obtain your credit information from consumer credit reporting agencies at any time. If we bill you for the Services and we determine that you may be a credit risk for (1) unsatisfactory credit rating; (2) insufficient credit history; (3) fraudulent or abusive use of any AT&T services within the last five years; or (4) late payments for current or prior bills, we may require a deposit (or an advance payment as permitted by state law) to ensure payment for the Services. The amount of the deposit will be no more than any estimated onetime charges required for the Services, plus three months of the estimated average per-minute charges and/or monthly fees for the Services. We will pay simple interest at the annual rate of 4% on the deposit, subject to the state law where you receive the Services. If you fail to pay for the Services when due, we may use the deposit without giving notice to you. If you pay undisputed bills by the due date for twelve consecutive billing months, we will credit the deposit to your account. If a credit balance remains on your account, we will refund or credit that amount.

g. Credit Limits. If we bill you for the Services, we may set a credit limit based on your payment history or your credit score from consumer credit reporting agencies. If we do this, we will notify you of your initial credit limit and all changes to your credit limit. If you exceed your credit limit, we will restrict your access to the Services, including direct-dialed, operator-assisted, and calls requiring a 900 or 976 prefix. Access to emergency services will not be affected by this restriction. If you fail to make timely payments, we may also lower your credit limit.

## 2. SUSPENDING AND CANCELING THE SERVICES.

a. Your Cancellation of the Services. If you use more than one Service, you may change or cancel individual Services by calling the AT&T customer service number on your AT&T bill, subject to the applicable terms and conditions in the AT&T Service Guides. This Agreement remains in effect for any Services that you continue to be enrolled in, use, or pay for. If you want to cancel all of the Services, discontinue your use of all of the Services, and call us toll free at 1 888 288-4099 for further instructions.

b. Fraudulent Use. You will not use the Services for any unlawful, abusive, or fraudulent purpose, including, for example, using the Services in a way that (1) interferes with our ability to provide Services to you or other customers; or (2) avoids your obligation to pay for the Services. If AT&T has reason to believe that you or someone else is abusing the Services or using them fraudulently or unlawfully, we can immediately suspend, restrict, or cancel the Services without advance notice.

c. Failure to Pay. Upon advance notice, we may suspend, restrict, or cancel the Services and this Agreement, if you do not make payments for current or prior bills by the required due date, including payments for late fees or any other required additional charges.

d. Other. AT&T may from time to time discontinue certain Services, subject to applicable law and regulation.

e. Outstanding Charges. If Services are suspended, restricted, or cancelled, any charges will accrue through the date that AT&T fully processes the suspension, restriction or cancellation. You must pay all outstanding charges for these Services, including payment of any bills that remain due after the date of cancellation. Subject to Section 7, you must reimburse us for any reasonable costs we incur, including attorneys' fees, to collect charges owed to us. If you want us to renew the Services, we may require that you pay a deposit.

## 3. INDEMNIFICATION.

YOU AGREE THAT WE SHOULD NOT BE RESPONSIBLE FOR ANY THIRD PARTY CLAIMS AGAINST US THAT ARISE FROM YOUR USE OF THE SERVICES. FURTHER, YOU AGREE TO REIMBURSE US FOR ALL COSTS AND EXPENSES RELATED TO THE DEFENSE OF ANY SUCH CLAIMS, INCLUDING ATTORNEY'S FEES, UNLESS SUCH CLAIMS ARE BASED ON OUR WILLFUL MISCONDUCT OR GROSS NEGLIGENCE. THIS PROVISION WILL CONTINUE TO APPLY AFTER THE AGREEMENT ENDS.

## 4. LIMITATIONS OF LIABILITY.

THIS SECTION DESCRIBES THE FULL EXTENT OF OUR RESPONSIBILITY FOR ANY CLAIMS YOU HAVE FOR DAMAGES CAUSED BY THE FAILURE OF THE SERVICES, OR ANY OTHER CLAIMS IN CONNECTION WITH THE SERVICES OR THIS AGREEMENT.

IF OUR NEGLIGENCE CAUSES DAMAGE TO PERSON OR PROPERTY, WE WILL BE LIABLE FOR NO MORE THAN THE AMOUNT OF DIRECT DAMAGES TO THE PERSON OR PROPERTY. FOR ANY OTHER CLAIM, WE WILL NOT BE LIABLE FOR MORE THAN THE AMOUNT OF OUR CHARGES FOR THE SERVICES DURING THE AFFECTED PERIOD. FOR ALL CLAIMS, WE WILL NOT BE LIABLE FOR INDIRECT OR CONSEQUENTIAL DAMAGES, INCLUDING BUT NOT LIMITED TO, LOST PROFITS OR REVENUE OR INCREASED COSTS OF OPERATION WE ALSO WILL NOT BE LIABLE FOR PUNITIVE, RELIANCE OR SPECIAL DAMAGES. THESE LIMITATIONS APPLY EVEN IF THE DAMAGES WERE FORESEEABLE OR WE WERE TOLD THEY WERE POSSIBLE, AND THEY APPLY WHETHER THE CLAIM IS BASED ON CONTRACT, TORT, STATUTE, FRAUD, MISREPRESENTATION, OR ANY OTHER LEGAL OR EQUITABLE THEORY.

WE WILL NOT BE LIABLE FOR ANY DAMAGES IF SERVICES ARE INTERRUPTED, OR THERE IS A PROBLEM WITH THE INTERCONNECTION OF OUR SERVICES WITH THE SERVICES OR EQUIPMENT OF SOME OTHER PARTY. THIS SECTION WILL CONTINUE TO APPLY AFTER THE AGREEMENT ENDS.

## 5. WARRANTIES.

EXCEPT AS THIS AGREEMENT EXPRESSLY STATES, WE MAKE NO EXPRESS WARRANTY REGARDING THE SERVICES AND DISCLAIM ANY IMPLIED WARRANTY, INCLUDING ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE WE ALSO MAKE NO WARRANTY THAT THE SERVICES WILL BE UNINTERRUPTED OR ERROR FREE WE DO NOT AUTHORIZE ANYONE, INCLUDING, BUT NOT LIMITED TO, AT&T EMPLOYEES, AGENTS, OR REPRESENTATIVES, TO MAKE A WARRANTY OF ANY KIND ON OUR BEHALF AND YOU SHOULD NOT RELY ON ANY SUCH STATEMENT.

## 6. CREDIT ALLOWANCES FOR INTERRUPTIONS.

If an interruption or failure of Services is caused solely by AT&T and not by you or a third party or other causes beyond our reasonable control, you may be entitled to a credit allowance as specified in the applicable AT&T Service Guide.

## 7. DISPUTE RESOLUTION.

IT IS IMPORTANT THAT YOU READ THIS ENTIRE SECTION CAREFULLY. THIS SECTION PROVIDES FOR RESOLUTION OF DISPUTES THROUGH FINAL AND BINDING ARBITRATION BEFORE A NEUTRAL ARBITRATOR INSTEAD OF IN A COURT BY A JUDGE OR JURY OR THROUGH A CLASS ACTION YOU CONTINUE TO HAVE CERTAIN RIGHTS TO OBTAIN RELIEF FROM A FEDERAL OR STATE REGULATORY AGENCY

a. Binding Arbitration. The arbitration process established by this section is governed by the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1-16. You have the right to take any dispute that qualifies to small claims court rather than arbitration All other disputes arising out of or related to this Agreement (whether based in contract, tort, statute, fraud, misrepresentation or any other legal or equitable theory) must be resolved by final and binding arbitration. This includes any dispute based on any product, service, or advertising having a connection with this Agreement and any dispute not finally resolved by a small claims court. The arbitration will be conducted by one arbitrator using the procedures described by this Section 7. If any portion of this Dispute Resolution Section is determined to be unenforceable, then the reminder shall be given full force and effect.

The arbitration of any dispute involving $10,000 or less shall be conducted in accordance with the Consumer Arbitration Rules of the American Arbitration Association ("AAA"), as modified by this Agreement, which are in effect on the date a dispute is submitted to the AAA. The AAA's Commercial Arbitration Rules and fee schedules will apply to any disputes in excess of $10,000 You have the right to be represented by counsel in an arbitration. In conducting the arbitration and making any award, the arbitrator shall be bound by and strictly enforce the terms of this Agreement and may not limit, expand, or otherwise modify its terms.

NO DISPUTE MAY BE JOINED WITH ANOTHER LAWSUIT, OR IN AN ARBITRATION WITH A DISPUTE OF ANY OTHER PERSON, OR RESOLVED ON A CLASS-WIDE BASIS. THE ARBITRATOR MAY NOT AWARD DAMAGES THAT ARE NOT EXPRESSLY AUTHORIZED BY THIS AGREEMENT AND MAY NOT AWARD PUNITIVE DAMAGES OR ATTORNEYS' FEES UNLESS SUCH DAMAGES ARE EXPRESSLY AUTHORIZED BY A STATUTE YOU AND AT&T BOTH WAIVE ANY CLAIMS FOR AN AWARD OF DAMAGES THAT ARE EXCLUDED UNDER THIS AGREEMENT.

b. Arbitration Information and Filing Procedures. Before you take a dispute to arbitration or to a small claims court, you must first contact our customer account representatives at the customer service number on your AT&T bill for the Services, or write to us at AT&T, P.O. Box 944078, Maitland, Florida 32794-4078, and give us an opportunity to resolve the dispute Similarly, before AT&T takes a dispute to arbitration,

942

 **AT&T**

Dear AT&T Customer,

Enclosed is your copy of the new AT&T Consumer Services Agreement containing terms and conditions for our state-to-state and international consumer long distance services. This Agreement will begin to apply to these AT&T services on August 1, 2001.

In the past, AT&T filed this information with the Federal Communications Commission (FCC). In keeping with recent FCC rulings, we will instead be providing this information directly to our customers and to consumers who have used our services in the last three months.

The Agreement covers AT&T state-to-state and international consumer calling services and explains the relationship between you and AT&T, as well as each of our rights and responsibilities, including billing and payment.

The Agreement also describes our new binding arbitration process, which uses an objective third party rather than a jury for resolving any disputes that may arise.

You accept the terms of the Agreement simply by continuing to use or pay for any AT&T state-to-state or international consumer calling service.

**Please be assured that your AT&T service or billing will not change under the AT&T Consumer Services Agreement; there's nothing you need to do.**

AT&T Service Guides are an additional part of the Services Agreement. They contain additional terms and conditions, including the prices, for the services we currently offer. AT&T Service Guides will be available for your review at _www.att.com/serviceguide/home_, or you can call us at 1 888 288-4099* to request a copy of the Service Guides that apply to your current AT&T state-to-state and international consumer calling services. The AT&T Service Guides will be available no later than July 9, 2001.

For additional information, please see the questions and answers included in this package, or visit our Web site at _www.att.com/serviceguide/home_ or call us at 1 888 288-4099.*

Thank you for using AT&T.

Sincerely,

_Leu Mariani_

Leonard A. Mariani
Vice President, AT&T Consumer Services

P.S. As a special opportunity, you can receive a credit of $1 on your AT&T Long Distance bill every month† You'll also receive a $25 Amazon.com certificate from AT&T.‡ Simply sign up for our convenient AT&T online billing option. For offer details and to sign up, visit _www.att.com/econsumer._

*Customers outside the U.S. call: 1 877 288-4725.
TTY for customers with hearing/speech disabilities: 1 800 833-3232.
† Certain conditions apply. See _www.att.com/econsumer_ for details.
‡ This offer applies to most plans and is subject to billing availability

U.S. District Court (Northern District of California)
Case No._____ C-01-2969-BZ
Case Name: _____ TING v. AT&T
**JOINT** Exhibit No. 1
Date Entered___ 11/3/01
Signature___

**Please see the other side of this page for additional information.**

## ATTACHMENT NO. 3

## Frequently Asked Questions

**Q:** Why is AT&T sending me this Services Agreement?
**A:** AT&T and other long distance companies currently file "tariffs"—the legal word for the terms and conditions under which we provide services to our customers—with the FCC. As a result of recent FCC rulings, AT&T will no longer file tariffs for our services. These terms and conditions will now be provided in this AT&T Consumer Services Agreement. The Agreement will apply to state-to-state and international long distance services beginning August 1, 2001.

**Q:** Will this Services Agreement affect my AT&T service, and do I need to take any action?
**A:** No. The AT&T Consumer Services Agreement will have no impact on the service you receive, the price you pay for it, or your ability to change your service. You accept the terms and conditions simply by continuing to use or pay for any AT&T state-to-state or international consumer long distance service. Please retain this Agreement for future reference.

**Q:** Will the AT&T Consumer Services Agreement apply to other AT&T services, such as AT&T WorldNet® Service?
**A:** No. AT&T Internet services, AT&T Wireless Services, and AT&T video services are covered by different agreements. In addition, the Agreement does not cover AT&T local services or AT&T in-state long distance services.

**Q:** What are AT&T Service Guides and where can I find them?
**A:** AT&T Service Guides describe each of the many available AT&T services, as well as any special terms and conditions that apply. There is a separate AT&T Service Guide for each of our calling plans, detailing the plan's rates, monthly fees, and other terms. You can find the AT&T Service Guides online at _www.att.com/serviceguide/home_ no later than July 9, 2001, or write to us at AT&T, P.O. Box 944050, Maitland, FL 32794-4050, to request specific Service Guides. You must include your telephone number, the name of your local phone company, and the name and billing address (including ZIP code) that appears on your bill. You can also request a written copy of the Service Guides that apply to the products and services that you are enrolled in by calling 1 888 288-4099.*

**Q:** What are your most popular long distance plans?
**A:** Customers choose a basic rate plan or one of our calling plans for their state-to-state and international calls from home. Basic plan calls generally have higher per-minute rates but have no monthly plan charges. Most calling plans have a lower per-minute rate but charge a monthly fee or minimum. As examples, the following rates were in effect as of April 1, 2001: AT&T One Rate® 7¢ Plan offers a rate of 7¢ per minute for state-to-state calling from home with a monthly fee of $5.95. For state-to-state calls away from home, customers can obtain the AT&T Calling Card and pay only 25¢ per minute with a $1 monthly fee if they select the AT&T One Rate® Calling Card Plan. If they choose not to sign up for this card plan, rates will range up to 89¢ per minute plus applicable service charges. Generally, consumers can save with our calling plans if they make a lot of long distance calls. You can check a recent phone bill to determine if you're on one of our calling plans and the rates you are paying.

**Q:** Does the FCC ruling cover in-state services?
**A:** No. Each state's laws and public utility or public service commission rules govern in-state telecommunications services. They are not affected by the FCC proceedings. In-state services will continue to be provided pursuant to state tariffs, where applicable.

**Q:** What types of state-to-state and international long distance calls does the AT&T Consumer Services Agreement cover?
**A:** The Agreement will apply to nearly all types of state-to-state and international long distance calls. These include AT&T Consumer Long Distance, AT&T Calling Card, AT&T Easy Reach 800® calls; AT&T collect, person-to-person, billed-to-third-party, and other operator-assisted calls; commercial credit card calls, and your local exchange company calling card calls placed over the AT&T Network. Calls made by dialing 10-10-345 will not be covered by this Agreement.

**Q:** Is there anything in this Agreement that is different from the terms and conditions filed with the FCC?
**A:** Yes. There are two notable changes in particular:
(1) Binding arbitration. Any disputes that may arise between AT&T and customers that cannot be resolved informally must now be resolved through binding arbitration (or through small claims court, if you choose). In arbitration, disputes must be decided by an objective third party rather than a jury. Arbitration is a quicker and more convenient way to settle disputes without the hassle and cost of a court case. It's in addition to the remedies consumers have through federal and state agencies.
(2) Notification of price increases. Effective August 1, 2001, AT&T will notify you of price increases for direct-dialed long distance calls from home that are covered under your AT&T calling plans. We will also notify you of price increases for state-to-state calls made under the basic schedule calling plans. This information will also be available in a recorded announcement on our toll-free number, 1 888 288-4099.* Announcements will be updated with future price increase information on the first and the fifteenth day of each month. In addition, all price increases for AT&T state-to-state and international consumer calling services will be posted on our Web site, _www.att.com/serviceguide/home_, before the increases go into effect.

*Customers outside the U.S. call: 1 877 288-4725.
TTY for customers with hearing/speech disabilities: 1 800 833-3232.

©2001 AT&T. All Rights Reserved. ® Printed on recycled paper DTL

944

ATTACHMENT NO. 4

 AT&T

P.O. Box 944080
Maitland, FL 32794-4080

FORWARDING SERVICE REQUESTED

PRESORTED
STANDARD
US POSTAGE
PAID
AT&T

ATTENTION: Important information
concerning your AT&T service enclosed.

Plaintiffs are hereby **ORDERED** by **Wednesday, January 31, 2002,** to file and serve a proposed permanent injunction and final judgment. A copy on diskette shall be lodged with chambers.